STATE of Alaska, Joel Gilbertson in his official capacity as Alaska Commissioner of Health & Social Services, Marcia Kennai, in her official capacity as Deputy Commissioner of the Office of Children's Services, Phillip Mitchell, in his official capacity as Chief of the Alaska Bureau of Vital Statistics, and Gregg Renkes, in his official capacity as Attorney General, Appellants,

v.

NATIVE VILLAGE OF TANANA, Dan Schwietert, Theresa Schwietert, Nulato Village, Village Of Kalskag, Akiak Native Community, Village Of Lower Kalskag, and Kenaitze Indian Tribe, Appellees.

No. S–13332.

Supreme Court of Alaska.

March 4, 2011.

Peter K. Putzier, Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellants.

Heather Kendall–Miller, Native American Rights Fund, Anchorage, Lloyd B. Miller, Sonosky, Chambers, Sachse, Miller & Munson, LLP, Anchorage, and Andy Harrington, Alaska Legal Services Corporation, Fairbanks, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

In this case we revisit ripeness and tribal sovereignty decisions intersecting in a dispute between the State of Alaska and a number of Alaska Native tribes. Procedurally, we are asked whether the narrowed view of ripeness announced in *Brause v. State, Department of Health & Social Services*[1] and recently applied in *State v. ACLU of Alaska*[2] requires dismissal of this case without reaching its merits. Substantively, we are asked (1) whether the inherent sovereign jurisdiction of Alaska Native tribes recognized over a decade ago in *John v. Baker*[3] includes the initiation of "child custody proceedings" as that term is used in the Indian Child Welfare Act (ICWA), and (2) if so, whether tribal court judgments in those proceedings are entitled to full faith and credit by the State.

---

1. 21 P.3d 357 (Alaska 2001).

2. 204 P.3d 364 (Alaska 2009).

3. 982 P.2d 738 (Alaska 1999).

We conclude that this dispute is ripe for a limited decision, acknowledging that further refinements and qualifications must arise from future adjudications based on specific factual scenarios. Today we decide that (1) federally recognized Alaska Native tribes are not necessarily precluded from exercising inherent sovereign jurisdiction to initiate "child custody proceedings" as ICWA defines that term, and (2) judgments issued in those proceedings may be entitled to full faith and credit by the State under ICWA. But lack of specific facts precludes us from defining the extent of any individual Alaska Native tribe's inherent sovereign jurisdiction to initiate "child custody proceedings" or the standards for determining which judgments would be entitled to full faith and credit by the State.

## II. PROCEEDINGS

Native Village of Tanana (Tanana), Nulato Village (Nulato), Akiak Native Community (Akiak), Village of Kalskag (Kalskag), Village of Lower Kalskag (Lower Kalskag), and Kenaitze Indian Tribe (Kenaitze) are recognized as Indian tribes by the United States Department of the Interior,[4] and all but Kenaitze are listed as "Alaska Native villages" under the Alaska Native Claims Settlement Act (ANCSA).[5] In this opinion, we refer to the tribal appellees collectively as "the Tribes."[6]

The Tanana Tribal Court, the Nulato Tribal Council, and the Kenaitze Tribal Court all hear children's proceedings initiated by their tribes or transferred from state court, and they issue decrees establishing protection, guardianship, and custody of children.[7] Ak-

iak's Quanerceraarviat Tribal Court hears children's cases, including tribally initiated child protection cases, and issues orders and adoption decrees. The Kalskag Traditional Council initiates child protection proceedings. The Lower Kalskag Tribal Court hears matters involving allegations of child abuse or neglect.

In late October 2004 the Tribes[8] sued the State of Alaska and—in their official capacities—the Attorney General and heads of the Office of Children's Services (OCS), Bureau of Vital Statistics (BVS), and Department of Health and Social Services (DHSS), collectively "the State." The Tribes alleged that based on an October 1, 2004 opinion letter from then-Attorney General Gregg Renkes (2004 Attorney General Opinion), the State adopted a policy and began taking official action to interfere with tribal rights under ICWA and to deny full faith and credit to tribal adoption decrees and orders issued in tribally initiated child protection cases. The Tribes sought declaratory relief recognizing that Alaska Native tribes "possess inherent and concurrent jurisdiction to adjudicate children's proceedings and issue tribal court decrees" and injunctive relief forcing "the [S]tate and its agencies to grant full faith and credit to tribal court decrees as required by law."

In late December 2004 the State moved to dismiss the suit on ripeness grounds. In response the Tribes moved for leave to file an amended complaint in early January 2005, which the State opposed on ripeness and futility grounds. The superior court granted the Tribes' motion in early March 2005 and

---

**4.** Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed.Reg. 54,364, 54,368–69 (Oct. 21, 1993) (listing federally recognized tribes); Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 68 Fed.Reg. 68,180, 68,-183–84 (Dec. 5, 2003) (same).

**5.** 43 U.S.C. §§ 1602(c), 1610(b) (2000).

**6.** The individual appellees, Dan and Theresa Schwietert, adopted a special-needs Alaska Native child through the Tanana Tribal Court in June 2004 and received a birth certificate from the State. Although plaintiffs below, the Schwieterts participated in the litigation in a collateral

supporting role to the Tribes, and the final judgment does not mention the Schwieterts.

**7.** ICWA defines "tribal court" in relevant part as "a court with jurisdiction over child custody proceedings and which is ... established and operated under the code or custom of an Indian tribe, or any other administrative body of a tribe which is vested with authority over child custody proceedings." 25 U.S.C. § 1903(12) (2000).

**8.** The original five plaintiff tribes were Tanana, Nulato, Kalskag, Akiak, and Lower Kalskag. The Tribes amended their complaint twice to add plaintiffs: first to add the Schweierts and second to add Kenaitze.

accepted the amended complaint. After oral argument Superior Court Judge John Suddock subsequently denied the State's dismissal motion from the bench, stating in part:

> [A]s the pleading[ ] says, the tribal courts are behaving as if they have original jurisdiction in these matters. They are actually adjudicating them and they are placing children based on them and the [S]tate is here saying ... ["]that's void. Those courts are [a] nullity. Any of those parents could go get those children back and not be in violation of a binding court order because it's void ab initio.["] Strikes me that that's a bad situation, that there is a very ripe question for a review: whether or not the Attorney General ever put pencil to paper ... there is a network of tribal courts out there that has assumed a jurisdiction beyond ... what the [S]tate contends is proper. Ordinary citizens are being affected. Children are being affected. It seems to me that there is a ripe question for declaratory judgment.

In November 2005 the Tribes moved for partial summary judgment on the legal issue of Alaska Native tribes' "inherent sovereign authority ... to adjudicate children's proceedings." The State opposed the Tribes' motion and cross-moved for summary judgment, arguing that the 2004 Attorney General Opinion accurately interpreted existing Alaska case law and that the Tribes "do not possess the inherent authority to initiate child protection cases."

Superior Court Judge Sen K. Tan granted the Tribes' motion for partial summary judgment in May 2007, ruling that "tribes retain concurrent jurisdiction to legislate, to initiate, and to adjudicate [child in need of aid] cases in tribal courts." Upon the State's urging that the partial summary judgment granted the Tribes all the relief requested in their amended complaint, Judge Tan issued a final judgment on August 26, 2008.

The relevant language from the declaratory judgment portion of the final judgment is as follows:

> 1. [The Tribes] possess inherent [sovereign] jurisdiction to initiate child custody proceedings.... The [Tribes] share concurrent jurisdiction with the State ... over child custody proceedings as the term is defined by the ICWA[,] 25 U.S.C. § 1903.
>
> 2. [The Tribes] are entitled to access ... confidential reports and other documents in the possession of [OCS] concerning their member children.
>
> 3. [The Tribes] are entitled to full faith and credit under 25 U.S.C. § 1911(d) for their public acts, records, and judicial proceedings to the same extent that the State ... gives full faith and credit to the public acts, records[,] and judicial proceedings of any other [s]tate.

The final judgment also enjoined the State from: (1) implementing the 2004 Attorney General Opinion by adopting policies or regulations; (2) relying on, enforcing, or carrying out any mandate based on the 2004 Attorney General Opinion that is contrary to the superior court's decision; (3) denying full faith and credit to the Tribes' determinations in ICWA–defined child custody proceedings; (4) refusing to notify the Tribes of reports of harm and provide such reports of harm for investigation; and (5) denying the Tribes information they otherwise are entitled to receive under ICWA.

The State appeals.

## III. STANDARD OF REVIEW

 We evaluate de novo the issue of ripeness.[9] We evaluate de novo the scope of tribal jurisdiction and the meaning of federal statutes.[10] Under de novo review, we apply "the rule of law that is most persuasive in light of precedent, reason, and policy." [11]

---

9. *ACLU of Alaska,* 204 P.3d at 367–68 (clarifying standard of review and rejecting abuse of discretion standard suggested in earlier decisions).

10. *John v. Baker,* 982 P.2d at 744.

11. *Glamann v. Kirk,* 29 P.3d 255, 259 (Alaska 2001) (quoting *Philbin v. Matanuska–Susitna Borough,* 991 P.2d 1263, 1266 (Alaska 1999)).

## IV. DISCUSSION

Today's decision requires a review of: ICWA; Alaska and federal decisions regarding Alaska Native tribal sovereignty over ICWA–defined "child custody proceedings"; *John v. Baker*; and the State's reaction to *John v. Baker* both prior to and after October 1, 2004. This backdrop provides the necessary context for us to address both the procedural ripeness and substantive sovereignty questions before us.

### A. ICWA And Relevant Authorities
#### 1. Relevant ICWA provisions

In 1978 Congress enacted ICWA with the goal of:

protect[ing] the best interests of Indian children and ... promot[ing] the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.[12]

Congress found "that there is no resource ... more vital to the continued existence and integrity of Indian tribes than their children"[13] and "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions."[14] Congress further found that when "exercising their recognized jurisdiction over Indian child custody proceedings" states "have often failed to recognize the essential tribal relations of Indian people and [their] cultural and social standards."[15]

In short, ICWA "constructs a statutory scheme to prevent states from improperly removing Indian children from their parents, extended families, and tribes."[16] "Its most important procedural elements include establishing tribal courts as the required or preferred forum for adjudication of Indian child custody proceedings."[17] The United States Supreme Court declared over 20 years ago that "Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities. More specifically, [ICWA's] purpose was, in part, to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings."[18]

ICWA § 1911, titled "Indian tribe jurisdiction over Indian child custody proceedings," limits state jurisdiction over ICWA–defined child custody proceedings in two ways.[19] First, § 1911(a) provides that Indian tribes have exclusive jurisdiction of child custody

---

12. Indian Child Welfare Act, Pub.L. No. 95–608, § 3, 92 Stat. 3069 (1978) (codified at 25 U.S.C. § 1902 (2000)); *accord A.B.M. v. M.H.*, 651 P.2d 1170, 1172 (Alaska 1982).

13. 25 U.S.C. § 1901(3) (2000); *see also John v. Baker*, 982 P.2d at 747 ("[T]he statute 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'" (quoting H.R.Rep. No. 95–1386, at 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546)).

14. 25 U.S.C. § 1901(4); *accord John v. Baker*, 982 P.2d at 746.

15. 25 U.S.C. § 1901(5).

16. Cohen's Handbook of Federal Indian Law § 11.01[1], at 820 (Nell Jessup Newton ed., 2005 ed.) (hereinafter Cohen's Handbook).

17. Conference of W. Att'ys Gen., American Indian Law Deskbook 571 (4th ed. 2008) (hereinafter Indian Law Deskbook); *see also* B.J. Jones, Mark Tilden & Kelly Gaines-Stoner, The Indian Child Welfare Act Handbook 5 (2d ed. 2008) (hereinafter ICWA Handbook) (identifying one of ICWA's primary objectives as "encourag[ing] tribal court adjudication of child custody proceedings involving Indian children").

18. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 45, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (emphasis in original) (footnote omitted).

19. 25 U.S.C. § 1911 (2000). For ICWA's purposes, "child custody proceeding" means and includes foster care placements, actions to terminate parental rights, preadoptive placements, and adoptive placements. 25 U.S.C. § 1903(1). ICWA generally does not apply to divorce or divorce-like child custody proceedings. *See id.*; *John v. Baker*, 982 P.2d at 746–47; Indian Law Deskbook, note 17, above, at 574–75; ICWA Handbook, note 17, above, at 27–28.

proceedings involving Indian children residing or domiciled in Indian country, unless federal law otherwise vests jurisdiction in the state.[20] Tribes also retain exclusive jurisdiction over tribal court wards regardless of residence or domicile.[21] Second, § 1911(b) provides that state courts must transfer foster care placement and parental right termination proceedings involving Indian children not residing or domiciled within Indian country to tribal courts upon petition, except in specific circumstances.[22]

ICWA § 1918(a) provides that "[a]ny Indian tribe which became subject to [s]tate jurisdiction pursuant to the provisions of ... any ... [f]ederal law, may reassume jurisdiction over child custody proceedings."[23] To reassume jurisdiction, a tribe must petition the Secretary of the Interior and provide a suitable plan for exercising jurisdiction.[24]

ICWA § 1911(d) provides that states "shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity."[25]

### 2. Early Alaska precedent regarding ICWA and Alaska Native tribal sovereignty

In our 1986 decision *Native Village of Nenana v. State, Department of Health & Social Services*, we held that Public Law 280 (P.L. 280) divested Alaska Native tribes of any jurisdiction under ICWA § 1911(a) and (b).[26] *Nenana* concerned a superior court's denial of Native Village of Nenana's petition for transfer of a child protection proceeding

---

**20.** "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

An "Indian tribe" is "any Indian tribe ... recognized as eligible for the services provided to Indians by the [Secretary of the Interior]," including "any Alaska Native village" defined in 43 U.S.C. § 1602(c) of ANCSA. *Id.* § 1903(8), (11).

The term "reservation" in ICWA means, in pertinent part, "Indian country" as defined in 18 U.S.C. § 1151. 25 U.S.C. § 1903(10). "Indian country" is defined as "(a) all lands within the limits of any Indian reservation ..., (b) all dependent Indian communities within the borders of the United States ..., and (c) all Indian allotments, the Indian titles to which have not been extinguished." 18 U.S.C. § 1151 (2000).

**21.** 25 U.S.C. § 1911(a). Although "ward" is not defined in ICWA,

and there is very little guidance in the legislative history or [Bureau of Indian Affairs] guidelines as to its import[,] ... [t]he most commonly accepted understanding of wardship is that when a tribal court, or a tribal governing council, has exercised legitimate jurisdiction over an Indian child in a child custody proceeding and continues to exercise that jurisdiction, a state court's exercise of jurisdiction is precluded, except, of course, on an emergency basis.

ICWA HANDBOOK, note 17, above, at 58 (footnote omitted).

**22.** 25 U.S.C. § 1911(b). Section 1911(b) "creates three checks on tribal transfer jurisdiction": (1) either parent's objection; (2) the tribe's declination of jurisdiction; and (3) the state court's finding of good cause to deny transfer. *In re*

C.R.H., 29 P.3d 849, 853 (Alaska 2001); *see generally* ICWA HANDBOOK, note 17, above, at 59–69. ICWA does not address tribes' power to receive adoptive or preadoptive cases, "nor is there much discussion of this apparent discrepancy in case law." *Id.* at 60.

**23.** 25 U.S.C. § 1918(a) (2000).

**24.** 25 U.S.C. §§ 1903(11), 1918(a). Of Alaska's approximately 230 federally recognized tribes, only two have successfully petitioned to reassume jurisdiction: Native Village of Barrow and Native Village of Chevak both reassumed exclusive jurisdiction over child custody proceedings involving member children residing or domiciled within their respective villages by petition in 1999. Approval of Petition for Reassumption of Exclusive Jurisdiction for Native Village of Chevak, 64 Fed.Reg. 36,391 (July 6, 1999); Approval of Petition for Reassumption of Exclusive Jurisdiction for Native Village of Barrow, 64 Fed.Reg. 36,391 (July 6, 1999); Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 73 Fed. Reg. 18,553, 18,556–57 (Apr. 4, 2008).

**25.** 25 U.S.C. § 1911(d).

**26.** 722 P.2d 219, 221 (Alaska 1986). Provisions of P.L. 280 give enumerated states both criminal and civil jurisdiction in Indian country, with the exception of specified reservations. Act of Aug. 15, 1953, Pub.L. No. 83–280, §§ 2, 4, 67 Stat. 588, 588–89 (codified at 18 U.S.C. § 1162 (2000) and 28 U.S.C. § 1360 (2000), respectively). Alaska has been enumerated as a state under P.L. 280 since 1958. Act of Aug. 8, 1958, Pub.L. No. 85–615, 72 Stat. 545.

to its jurisdiction.[27] Because ICWA § 1918(a) specifically mentions P.L. 280 as a federal law that extends state jurisdiction over some Indian tribes, we concluded that "Congress intended that [P.L.] 280 give certain states, including Alaska, exclusive [rather than concurrent] jurisdiction over matters involving the custody of Indian children, and that those states exercise such jurisdiction until a particular tribe petitions to reassume jurisdiction ... and the Secretary of the Interior approves [the] tribe's petition."[28] We also noted that § 1911(b) transfer jurisdiction "may actually grant Indian tribes greater authority than they had prior to the Act" because "[r]egardless of whether [P.L.] 280 vests exclusive or concurrent jurisdiction in the applicable states, *prior* to [ICWA], Indian tribes may not have had jurisdiction over custody proceedings ... where the child was domiciled off the reservation."[29]

In 1987[30] and again in 1992[31] we confirmed *Nenana*'s holding that Alaska Native tribes could not exercise jurisdiction under ICWA § 1911(a) or (b) until they had successfully petitioned for reassumption.

Our 1987 decision *In re K.E.* concerned the superior court's denial of a tribe's request for § 1911(b) transfer of a parental rights termination proceeding from state court to tribal court.[32] The tribe argued it had exclusive § 1911(a) jurisdiction based on the child's domicile "within the dependent [I]ndian community of Nenana,"[33] a reference to "Indian country."[34] We recognized *Nenana* as "controlling authority" and held that regardless of whether an Indian child resides or is domiciled in Indian country, the tribe must

successfully petition to reassume jurisdiction over child custody proceedings before it can exercise § 1911(a) or § 1911(b) jurisdiction.[35]

Our 1992 decision *In re F.P.* concerned tribal jurisdiction under § 1911(a).[36] After DHSS took emergency protective custody of three Indian children, Native Village of Circle unsuccessfully argued to the superior court that the state court proceeding should be dismissed in light of the tribe's exclusive § 1911(a) jurisdiction over the children as tribal court wards.[37] On appeal Circle asked us to review *Nenana* and *K.E.* in light of then-recent Ninth Circuit Court of Appeals cases, particularly one in which the Ninth Circuit concluded that if the two Alaska Native villages involved "were 'modern day successors to sovereign historical bands of [N]atives,'" then those villages had concurrent jurisdiction in child custody matters because they were "entitled to 'the same rights and responsibilities as ... sovereign bands of [N]ative Americans in the continental United States.'"[38] We concluded the Ninth Circuit opinion was contrary to our prior holding that "Congress intended that most Alaska Native groups not be treated as sovereigns" and held that *F.P.* was controlled by *Nenana.*[39] We reiterated *Nenana*'s holding that ICWA § 1918(a) indicated Congress intended P.L. 280 to give Alaska and certain other states exclusive and not concurrent jurisdiction over matters involving custody of Indian children, unless tribes successfully petitioned to reassume jurisdiction.[40] Chief Justice Rabinowitz was persuaded by the Ninth Circuit's analysis and dissented, asserting that *Nenana* and *K.E.* should be overruled because P.L. 280 is not a divestiture statute,

27. 722 P.2d at 220.

28. *Id.* at 221.

29. *Id.* (emphasis in original).

30. *In re K.E.*, 744 P.2d 1173 (Alaska 1987).

31. *In re F.P.*, 843 P.2d 1214 (Alaska 1992).

32. 744 P.2d at 1173.

33. *Id.* at 1174.

34. *See* note 20, above.

35. *In re K.E.*, 744 P.2d at 1174–75.

36. *See* 843 P.2d at 1215 (noting tribe claimed exclusive jurisdiction).

37. *Id.;* Brief of Appellee at 2, *In re F.P.*, 843 P.2d 1214 (No. S–04742), 1991 WL 11666111, at *2.

38. *In re F.P.*, 843 P.2d at 1215 (quoting *Native Vill. of Venetie I.R.A. Council v. Alaska* (*Venetie* ), 944 F.2d 548, 558–59 (9th Cir.1991)).

39. *Id.* (quoting *Native Vill. of Stevens v. Alaska Mgmt. & Planning*, 757 P.2d 32, 34 (Alaska 1988)).

40. *Id.* at 1215–16.

but rather an extension of states' jurisdiction to be exercised concurrently with tribes.[41]

### 3. Federal precedent regarding ICWA and Alaska Native tribal sovereignty

As we observed in *F.P.*, Ninth Circuit case law has held that Alaska Native tribes can have inherent sovereign jurisdiction concurrent with the State in ICWA–defined child custody matters.[42] The 1991 decision *Native Village of Venetie I.R.A. Council v. Alaska* concerned the State's refusal to recognize two adoption decrees issued by Native Villages of Venetie and Fort Yukon.[43] The Ninth Circuit analyzed two substantive issues in resolving the dispute: "whether the [N]ative [V]illages are inherently sovereign, at least insofar as domestic relations or child-custody issues are concerned"; and, if so, "whether Congress has stripped the [V]illages of that aspect of sovereign authority which encompasses child-custody determinations." [44] As to inherent sovereignty, the Ninth Circuit determined "to the extent that Alaska's [N]atives formed bodies politic to govern domestic relations, to punish wrong-

doers, and otherwise to provide for the general welfare," then "modern-day successors to [those] sovereign historical bands of [N]atives ... are to be afforded the same rights and responsibilities as are sovereign bands of [N]ative Americans in the continental United States." [45] As to whether Congress stripped Alaska Native tribes of their inherent sovereignty over domestic relations and child-custody issues, the Ninth Circuit rejected the divestiture interpretation of P.L. 280 and held neither ICWA nor P.L. 280 "prevent[ed] [sovereign Alaska Native villages] from exercising concurrent jurisdiction." [46]

The Ninth Circuit directed that if on remand the district court determined either Native Village was "the modern-day successor[ ] to an historical sovereign band of [N]ative Americans," then the State of Alaska must afford "full faith and credit to adoption decrees issued by [that Native Village's] tribal courts." [47] On remand the District Court for the District of Alaska determined that Venetie was "a sovereign tribe as a matter of law" exercising adoption authority over its members, and accordingly that "the State of

---

**41.** *Id.* at 1216, 1218–19 (Rabinowitz, C.J., dissenting) (quoting *Venetie*, 944 F.2d at 560–62).

**42.** *Venetie*, 944 F.2d at 558–59, *cited in In re F.P.*, 843 P.2d at 1215.

**43.** *Id.* at 550–51.

**44.** *Id.* at 556.

**45.** *Id.* at 558–59.

**46.** *Id.* at 559–62.

**47.** *Id.* at 562. The Ninth Circuit recently relied on *Venetie*'s holding in *Kaltag Tribal Council v. Jackson*, an unpublished opinion. 344 Fed.Appx. 324 (9th Cir.2009), *cert. denied*, —— U.S. ——, 131 S.Ct. 66, 178 L.Ed.2d 22 (2010). There the Ninth Circuit relied on *Venetie* in affirming that under ICWA § 1911(d) the State must accord full faith and credit to an adoption decree issued by the Native Village of Kaltag's tribal court. *Id.* at 325. The Ninth Circuit stated that "[r]eservation status is not a requirement of jurisdiction because '[a] [t]ribe's authority over its reservation or Indian country is incidental to its authority over its members.' " *Id.* (quoting *Venetie*, 944 F.2d at 559 n. 12). The Ninth Circuit further held that "neither the ICWA nor [P.L.] 280 pre-

vented the Kaltag court from exercising jurisdiction." *Id.*

Even more recently, the District Court for the District of Alaska treated *Venetie* as persuasive authority. In *S.P. v. Native Village of Minto*, the district court concluded P.L. 280 did not divest Native Village of Minto's concurrent inherent sovereign jurisdiction to make a former village resident's child a tribal court ward and to terminate the parents' rights. No. 3:09–cv–0092–HRH, slip op. at 4–5, 12, 14 (D.Alaska Dec. 2, 2009) ("The Native Village of Minto has never petitioned the Secretary to reassume exclusive jurisdiction over Indian child custody proceedings; but the fact that the Native Village ... does not have exclusive jurisdiction over child custody matters of Indian children who are wards of the tribe does not preclude concurrent jurisdiction with the [S]tate."). The district court relied on *Venetie* and the *Kaltag Tribal Council* district court order in reaching this conclusion. *Id.* at 12–14 (discussing *Venetie*, 944 F.2d at 550, 555–56, 561–62; *Kaltag Tribal Council v. Jackson*, No. 3:06–cv–0211–TMB, slip op. at 10–11 (D.Alaska Feb. 22, 2008)). The district court expressly rejected the argument that tribal courts cannot initiate child custody proceedings as ICWA uses that term. *Id.* at 14–16 (relying in part on *Kaltag Tribal Council*, No. 3:06–cv–0211–TMB, at 7–8). Based in part on its jurisdiction ruling, the district court ultimately dismissed the case on abstention grounds. *Id.* at 16–18.

Alaska must afford full faith and credit to adoption decrees issued by [its] tribal courts." [48] According to a subsequent Ninth Circuit opinion, the State "later stipulated that Fort Yukon could also meet the requirements for tribal status." [49]

### B. *John v. Baker* And Its Aftermath
#### 1. *John v. Baker*

In our September 1999 *John v. Baker* decision, issued when *Nenana, F.P.*, and *K.E.* still controlled, we recognized concurrent inherent tribal jurisdiction outside the confines of Indian country to adjudicate non–ICWA child custody disputes between tribal members.[50] In *John v. Baker* a Northway Village member unsuccessfully sought sole custody of his children in the Northway Tribal Court before bringing an identical custody suit in superior court.[51] The children's mother moved to dismiss the superior court case based on the tribal court proceeding, but the superior court awarded the father primary custody of the children.[52] In an amicus brief filed in the ensuing appeal, the State urged us to hold that "Alaska tribes retained concurrent jurisdiction with the [S]tate over civil matters involving the domestic relations of their members" even after the enactment of P.L. 280.[53] The State expressed an interest in "cooperat[ing] more closely with tribes, avoiding duplicative programs and stretching ... combined resources further than ... could [be] manage[d] separately, particularly in the under-served regions of Alaska." [54]

We examined the Department of the Interior's 1993 list of federally recognized tribes, which "included Northway Village and most of the other Native villages in Alaska," and the list's preamble that the "villages and regional tribes listed ... have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States." [55] We also looked to the Federally Recognized Tribe List Act of 1994, which directs the Department to publish annual lists of tribes eligible for special programs and services because of their status as Indians,[56] and to the recognition in that act's text and legislative history of these tribes' "sovereignty," [57] "quasi-sovereign status," [58] and "government-to-government relationship [with] the United States ... as ... domestic dependent nation[s]." [59] We noted the Department lists published for 1995 through 1998 all included Alaska Native villages such as Northway.[60] In deference to recognition by Congress and the Executive Branch that particular Native American groups are sovereign tribes, we recognized that "Alaska Native tribes, by virtue of their inherent powers as sovereign nations," possess "inherent, non-territorial sovereignty allowing them to resolve domestic disputes between their own members." [61] Because "villages like Northway presumably do not occupy Indian country," we held "Northway's jurisdic-

---

**48.** *Native Vill. of Venetie I.R.A. Council v. Alaska,* Nos. F86–0075 CIV (HRH) & F87–0051 CIV (HRH), 1994 WL 730893, at *21–22 (D.Alaska Dec. 23, 1994).

**49.** *Native Vill. of Venetie I.R.A. Council v. Alaska,* 155 F.3d 1150, 1151 (9th Cir.1998).

**50.** *John v. Baker,* 982 P.2d at 748–49, 759.

**51.** *Id.* at 743. The children's mother was a member of Mentasta Village, but consented to the Northway Tribal Court's jurisdiction. *Id.*

**52.** *Id.*

**53.** Amicus Brief of the State of Alaska at 45, *John v. Baker,* 982 P.2d 738 (No. S–8099), 1998 WL 35180190, at *45.

**54.** *Id.* at 1.

**55.** *John v. Baker,* 982 P.2d at 749–50 (emphasis omitted) (citing and quoting Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed.Reg. at 54,365–66).

**56.** *Id.* at 750 (citing 25 U.S.C. § 479a, 479a–1).

**57.** *Id.* (citing Pub.L. No. 103–454, § 103, 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 479a note (2000))).

**58.** *Id.* (quoting H.R.Rep. No. 103–781, at 2–3 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3768, 3769).

**59.** *Id.* (quoting H.R.Rep. No. 103–781, at 2).

**60.** *Id.*

**61.** *Id.* at 748–49.

tion to adjudicate child custody disputes between village members" was concurrent with that of state courts.[62]

Although ANCSA extinguished all aboriginal title and claims to Alaska land and revoked all existing Indian reservations except for that of the Metlakatla Indian Community on the Annette Islands,[63] we held that ANCSA's elimination of nearly all Indian country in Alaska did not divest Alaska Native villages of their sovereign powers to adjudicate child custody disputes between village members.[64] We employed "the established principle under federal law that 'Indian tribes retain those fundamental attributes of sovereignty ... which have not been divested by Congress or by necessary implication of the tribe's dependent status.' "[65] We then noted that "internal functions involving tribal membership and domestic affairs" are within the "core set of sovereign powers that remain intact even though Indian nations are dependent under federal law."[66] We acknowledged that "the character of the power that the tribe seeks to exercise, not merely the location of events," determines "whether tribes retain their sovereign powers."[67] We determined that ANCSA did not "express any intent to force Alaska Natives to abandon their sovereignty," particularly "their powers to adjudicate domestic disputes between members,"[68] and that post–ANCSA congressional actions, including passage of ICWA seven years later, indicated Congress did not intend ANCSA to prevent Alaska Natives from continuing to regulate their internal affairs.[69] We concluded that "federal tribes derive the power to adjudicate internal domestic matters, including child custody disputes over tribal children, from a source of sovereignty independent of the land they occupy."[70]

Because we concluded that neither ICWA nor P.L. 280 applied,[71] we determined it was "neither necessary nor appropriate ... to reach the question of whether Nenana and its progeny were wrongly decided."[72] Although we recognized that "generally, Indian nations possess greater powers in Indian country than they do outside it" and that we would "create[ ] a disjunction in Indian law jurisprudence" by recognizing that Northway had greater powers outside Indian country than the tribal community inside Alaska's only reservation, we concluded "this inconsistency d[id] not create a justification to address issues ... not squarely before us."[73]

Chief Justice Matthews, joined by Justice Compton, dissented, concluding that "inherent tribal jurisdiction over custody applies only to cases arising within Indian coun-

62. *Id.* at 759.

63. *Id.* at 747–48 & n. 43 (citing 18 U.S.C. § 1151; *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 530–33, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998)).

64. *Id.* at 748–59.

65. *Id.* at 751 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)).

66. *Id.* (citing *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), *superseded on other grounds by* Act of Nov. 5, 1990, Pub.L. No. 101–511, § 8077(b)-(d), 104 Stat. 1856, 1892–93 *and* Act of Oct. 28, 1991, Pub.L. No. 102–137, § 1, 105 Stat. 646).

67. *Id.* at 752.

68. *Id.* at 753.

69. *Id.* at 753–54 (discussing Federally Recognized Tribe List Act of 1994; ICWA; and Indian Tribal Justice Act of 1993, Pub.L. No. 103–176, 107 Stat. 2004 (codified at 25 U.S.C. §§ 3601–31)).

70. *Id.* at 754; *see also id.* at 748–49.

71. We held ICWA did not apply because child custody disputes between parents fall under ICWA's divorce exception, even if the parents never married. *Id.* at 746–47; *see* note 19, above.

We held rulings interpreting P.L. 280 did not apply because P.L. 280's text states that it applies only to Indian country and because Northway Village, like most Alaska Native land, ceased to qualify for the "dependent Indian community" definition of Indian country after ANCSA extinguished most Indian country in Alaska. *John v. Baker*, 982 P.2d at 747–48 (quoting 18 U.S.C. § 1151 and citing *Native Vill. of Venetie Tribal Gov't*, 522 U.S. at 530–33, 118 S.Ct. 948).

72. *Id.* at 748.

73. *Id.* at 748 n. 46.

try." [74] Chief Justice Matthews looked to what he termed the "allocative principle" [75] and *Nenana* and *F.P.* in concluding that "if Alaska has exclusive jurisdiction to decide private custody cases which arise in Indian country, it has, by necessary implication, exclusive jurisdiction to decide private custody cases which arise outside of Indian country." [76]

### 2. The State's initial position after *John v. Baker; In re C.R.H.*

In September 2000, then–Governor Tony Knowles issued an administrative order "acknowledg[ing] the legal and political existence of the federally recognized [t]ribes within the boundaries of Alaska." [77] In addition to expressing "recogni[tion] and respect[ ]" for the tribes' "governmental status," the governor articulated a policy of "acknowledg[ing] any additional [t]ribes in Alaska that may be recognized by the federal government in the future" [78] and "foster[ing] a constructive and harmonious relationship between the [t]ribal and State governments." [79] He acknowledged the value of the "services that Alaska's [t]ribes contribute to the state's economic and social well-being by virtue of their direct [t]ribal authority and responsibility for the delivery of social, economic, cultural, and other programs and services." [80] The governor explained that in December 1999 he had invited Alaska Native tribes "to enter into a government-to-government dialogue with the State for the purpose of establishing a framework for ongoing State-[t]ribal relations." [81] In furtherance of the "promot[ion] and enhance[ment] [of] [t]ribal self-government ... and social, cultural, spiritual, and racial diversity," among other things, Governor Knowles committed the State "to working with [t]ribes to further strengthen Alaska's ability to meet the needs of Alaska's commu-

---

**74.** *Id.* at 766 (Matthews, C.J., dissenting).

**75.** The chief justice explained that under the allocative principle, unless Congress clearly provides otherwise, (1) state laws generally do not apply to tribal Indians within Indian country and (2) tribal authority does not apply outside of Indian country. *Id.* at 772 (citing *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995)).

**76.** *Id.* at 767–68 (citing *In re F.P.*, 843 P.2d at 1215–16; *Nenana*, 722 P.2d at 221). Chief Justice Matthews determined the United States Supreme Court used language indicating that P.L. 280 gave certain states full jurisdiction over Indian country to the exclusion of tribal jurisdiction. *Id.* at 808–09 (discussing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 208, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Solem v. Bartlett*, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 475, 488–89 n. 32, 498, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); *Bryan v. Itasca Cnty.*, 426 U.S. 373, 383, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 74, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962)). He also determined that the 1970 amendment to § 2 of P.L. 280, which the House Report explained was intended to "permit[ ] the Metlakatla Indian [C]ommunity on the Annette Islands in Alaska to exercise jurisdiction over minor offenses concurrent with ... Alaska," indicated that prior to 1970 the State exercised criminal jurisdiction exclusive of tribal jurisdiction in all Indian country in Alaska. *Id.* at 808, 810 (quoting H.R.Rep. No. 91–1545 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4783, 4783). The chief justice noted that the 1970 amendment also added language to § 2(c) of P.L. 280 referring to the § 2(a) areas of Indian country as "areas over which the several States have *exclusive jurisdiction*." *Id.* at 810 (emphasis added in dissenting opinion). The chief justice concluded that the amendment demonstrated the 91st Congress's belief that P.L. 280 granted states exclusive jurisdiction. *Id.* at 810–11. Based on parallel language in §§ 2 and 4 of P.L. 280, the chief justice extended the divestiture determination to the civil realm, stating "it is impossible to conclude that Congress intended to confer on the states exclusive criminal jurisdiction, but only concurrent civil jurisdiction." *Id.* at 810.

**77.** Administrative Order No. 186 (Sept. 29, 2000); *see generally* DAVID S. CASE & DAVID A. VOLUCK, ALASKA NATIVES AND AMERICAN LAWS 430–31 & n.409 (2d ed. 2002) (hereinafter CASE & VOLUCK) (describing Governor Knowles's actions and noting change from former Governor Walter J. Hickel's Administrative Order No. 125 (Aug. 16, 1991), generally opposing tribal sovereignty expansion, which in turn had overturned former Governor Steve Cowper's Administrative Order No. 123 (Sept. 10, 1990), recognizing existence of Alaska Native tribes).

**78.** Administrative Order No. 186.

**79.** *Id.*

**80.** *Id.*

**81.** *Id.*

nities and families." [82]

In April 2001 Governor Knowles and various federally recognized Alaska Native tribes signed the Millennium Agreement, "a framework for the establishment of lasting government-to-government relationships and an implementation procedure to assure that such relationships are constructive and meaningful and further enhance cooperation between the parties." [83] This agreement reflects the State's recognition that "[e]ach [signatory] [t]ribe has its own independent form of government and exercises inherent sovereign authority." [84] In turn, the signatory tribes acknowledged that "[t]he State of Alaska has a major responsibility to provide for the health, safety, and welfare of all Alaskans." [85]

In August 2001, two years after our *John v. Baker* decision, we decided *In re C.R.H.*[86] That case concerned the denial of a request by Native Village of Nikolai to transfer a child protection proceeding from superior court to tribal court.[87] The State, while defending against Native Village of Nikolai's appeal in *C.R.H.*, urged us to overturn *Nenana* and its progeny.[88] The State pointed to the conflict between (1) the Ninth Circuit's *Venetie* holding that some Alaska Native tribes have concurrent inherent authority over child protection matters affecting their members, undivested by P.L. 280, and (2) our *Nenana* holding that Alaska Native tribes may not assert jurisdiction over child protection matters unless they formally reassume jurisdiction over those matters under ICWA § 1918(a) because they were divested of it by

P.L. 280.[89] The State explained that it "felt compelled" to oppose the tribe's request for transfer because of *Nenana* and its progeny, but it was "in an untenable position" because *Nenana* and *Venetie* were irreconcilable.[90] The State argued in part that we should reexamine and overrule *Nenana* in light of *John v. Baker*'s holdings that Alaska's federally recognized tribes have "'inherent power [to] regulat[e] their internal and social relations,' including adjudicatory authority over child custody matters" and that P.L. 280 did not divest that authority outside of Indian country.[91]

We compared ICWA § 1911(a), which provides that tribes lack exclusive Indian country and wardship jurisdiction "where such jurisdiction is otherwise vested in the State by existing Federal law," with § 1911(b), which does not contain a parallel limiting provision for transfer jurisdiction.[92] We concluded that "Congress intended P.L. 280 to affect tribes' exclusive jurisdiction under subsection 1911(a), but did not intend P.L. 280 to affect transfer jurisdiction under subsection 1911(b)." [93] We therefore held that federally recognized tribes in Alaska may accept transfer of ICWA cases under § 1911(b) without formal reassumption of jurisdiction, and we overruled *Nenana*, *F.P.*, and *K.E.* to the extent they were inconsistent with that holding.[94] But having concluded that Congress gave tribes § 1911(b) transfer jurisdiction regardless of their P.L. 280 status, we found it unnecessary to reconsider whether Alaska

---

82. *Id.*

83. Millennium Agreement between the Federally Recognized Sovereign Tribes of Alaska and the State of Alaska ¶ 2, Apr. 11, 2001. Although the Millennium Agreement did not address substantive issues, *id.* at ¶ 10, ICWA authorizes agreements between states and Indian tribes "respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements ... for orderly transfer of jurisdiction on a case-by-case basis and ... for concurrent jurisdiction between States and Indian tribes." 25 U.S.C. § 1919(a) (2000).

84. Millennium Agreement between the Federally Recognized Sovereign Tribes of Alaska and the State of Alaska, note 83, above, at ¶ 12(a).

85. *Id.* at ¶ 13(b).

86. 29 P.3d 849 (Alaska 2001).

87. *Id.* at 850–51.

88. Appellee State of Alaska's Brief at 6, 41, *In re C.R.H.*, 29 P.3d 849 (No. S–9677).

89. *Id.* at 5.

90. *Id.*

91. *Id.* at 13, 25 (quoting *John v. Baker*, 982 P.2d at 754–55).

92. *In re C.R.H.*, 29 P.3d at 852.

93. *Id.*

94. *Id.* at 850–52.

Native tribes affected by P.L. 280 retained initiating jurisdiction under § 1911(a) concurrent with the State.[95]

DHSS subsequently requested an opinion from then–Attorney General Bruce Botelho on *C.R.H.*'s effect.[96] In the responsive memorandum, the Attorney General's office acknowledged that "no tribe in Alaska [could] exercise exclusive jurisdiction over its children based on either residency or domicile within the tribe's reservation" because the only tribe occupying a reservation, Metlakatla Indian Community, exercises concurrent jurisdiction.[97] The memorandum also acknowledged Native Village of Barrow's and Native Village of Chevak's successful petitions to reassume exclusive jurisdiction over matters involving their children.[98] As to Alaska's other tribes, the memorandum stated that before a child custody proceeding's initiation, a tribe and the State shared concurrent jurisdiction and either could take steps to protect a member child or membership-eligible child.[99] The memorandum explained that a tribe could exercise exclusive jurisdiction over a child either by (1) initiating a tribal court proceeding regarding an Indian child not already within the State's custody and declaring the child a tribal court ward or (2) receiving transfer of a case initiated in state court.[100] According to the memorandum, the State lacked authority to investigate a report of harm concerning an Indian child it knew was a tribal court ward, but the State could forward risk of harm information to the tribe.[101] Finally, the memorandum advised DHSS that in addition to recognizing cultural adoptions under ICWA § 1911(d), the State was required to "recognize tribal court adoption orders to the extent that it recognize[d] such orders from sister states and other foreign orders" because "*C.R.H.* removed all impediments that historically prevented [recognition of] tribal court adoptions." [102]

### 3. The State's position after October 1, 2004

On October 1, 2004, then-Attorney General Gregg Renkes issued a direction-changing advisory opinion regarding tribal jurisdiction and ICWA–defined child custody proceedings.[103] The 2004 Attorney General Opinion, based on *C.R.H.* and the *Nenana* remnants left in place after *C.R.H.*, and without acknowledging *John v. Baker*'s implications, concluded that:

> Alaska state courts have exclusive jurisdiction over child custody proceedings involving Alaska Native children unless (1) the child's tribe has successfully petitioned the Department of Interior to reassume exclusive or concurrent jurisdiction under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1918 or (2) a state superior court has transferred jurisdiction of the child's case to a tribal court in accordance with 25 U.S.C. § 1911(b) and the tribal court is exercising its jurisdiction.[104]

OCS then revised its Policy and Procedure Manual, citing the 2004 Attorney General Opinion as authority. The manual still recognizes Native Village of Barrow, Native Village of Chevak, and Metlakatla Indian Community as having exclusive or concurrent ICWA jurisdiction in their specified territories. But the manual redefines the meaning of "concurrent" jurisdiction exercisable by the remaining tribes: the 2002 edition states

**95.** *Id.* at 852. One early commentator noted that "[r]ead together with *John v. Baker*, *C.R.H.* confirms tribal concurrent ICWA jurisdiction as well." Case & Voluck, note 77, above, at 430 n.406.

**96.** Memorandum from Assistant Att'y Gen. Donna Goldsmith for Jay Livey, Dep't of Health & Soc. Srvs. Comm'r (Mar. 29, 2002) (No. 441–00–0005) *revoked by* 2004 Formal Op. Att'y Gen. 135.

**97.** *Id.* at 3; *see John v. Baker*, 982 P.2d at 748 n. 43 (noting Metlakatla Reservation on Annette Islands is Alaska's only post–ANSCA Indian reservation).

**98.** Memorandum From Assistant Att'y Gen. Donna Goldsmith, note 96, above, at 3.

**99.** *Id.* at 2.

**100.** *Id.* at 2, 4 n. 7.

**101.** *Id.* at 4.

**102.** *Id.* at 5.

**103.** 2004 Formal Op. Att'y Gen. 135.

**104.** *Id.* at 3.

that until a child custody proceeding is initiated, "the tribe and the [S]tate simultaneously share authority and either government may take the steps necessary to protect a child who may be at risk"; the 2004 edition removed that provision and otherwise limited concurrent jurisdiction to cases transferred from state court.

OCS also changed the way it shared information with tribes. Before 2004 OCS contacted a child's tribe "[a]s soon as possible, and if possible prior to the assignment for investigation" to ascertain whether the tribe already had custody of the child or wanted to take jurisdiction over a child protection proceeding. The 2004 Attorney General Opinion advised that OCS was authorized "to release information concerning minor children for whom state court proceedings have not been initiated" to a "tribe properly exercising jurisdiction over a child protection proceeding involving the tribe's member child," but that "OCS must promulgate regulations governing the release of this information." On March 21, 2005, OCS proposed new regulations for releasing information to tribes "if such a release is in the best interests of the child ... and the child is not [the subject of a child in need of aid] case where the child's tribe is not a party" or "to assist in an investigation of a report of harm."

One OCS supervisor described actual changes in OCS policy following the 2004 Attorney General Opinion as follows:

> Policies have changed recently regarding when we contact the tribe in investigations. . . . [W]e don't share information regarding investigations unless the investigation is underway. In other words, ... the tribe can't have access to allegations that are made unless I have releases from my clients. They can't get copies of Reports of Harm unless ..‚ the parent in the Report of Harm has signed a release. Until [the tribes] have intervened legally in a [child in need of aid] case. In which case, then, they get all that.

BVS also changed its policies based on the 2004 Attorney General Opinion. The 2004 Attorney General Opinion stated that "the [S]tate retains exclusive jurisdiction over Alaska Native adoption proceedings unless a tribe has reassumed jurisdiction" but the State's "longstanding policy" of "ratif[ying] Indian adoptions that occur under tribal custom as a matter of equity under state law" is unchanged. According to a letter from BVS to the Kaltag Tribal Council, BVS began refusing to accept tribal court adoption paperwork in October 2005 unless it was from Native Village of Barrow, Native Village of Chevak, or Metlakatla Indian Community, and began processing only cultural adoptions for the remaining tribes.

## C. Ripeness Analysis For This Case

■ As noted earlier, the State moved to dismiss the Tribes' suit on ripeness grounds. It contended the Tribes had alleged no actual harm, but rather presented nothing more than an abstract disagreement with an opinion by the Attorney General. The State pointed out the lawsuit was filed shortly after the 2004 Attorney General Opinion was issued and no actual controversy regarding implementation had yet arisen. Relying primarily on our 2001 decision *Brause v. State, Department of Health & Social Services*,[105] the State argued that in the absence of specific facts regarding actual governmental action to provide context, the case was not ripe and there was no need for the superior court to act.

The Tribes opposed the State's dismissal motion, arguing that (1) the State had taken action well beyond the mere issuance of an Attorney General's opinion, including changes in department manuals and actual dealings with tribes, and (2) then-existing Alaska case law on standing, including the concept of ripeness, required only the threat of future injury. Judge Suddock agreed with the Tribes.

During the briefing for this appeal we issued our decision in *State v. ACLU of*

---

**105.** 21 P.3d at 358–60 (discussing federal law and affirming, under abuse of discretion standard, superior court's dismissal on ripeness grounds of action for declaratory relief in connection with constitutional challenge to statute precluding same-sex marriage because plaintiffs had not alleged any specific denial of rights associated with marriage).

*Alaska.*[106] In that case we continued *Brause*'s new emphasis on federal ripeness law with respect to a narrow line of cases— those involving pre-enforcement constitutional challenges to statutes.[107] We stated that "the constitutionality of a statute generally may not be challenged as an abstract proposition" and looked to see if the plaintiffs had presented the basis for an exception to that general rule.[108] We then noted the similarity of our earlier cases warning against advisory opinions and resolving abstract questions of law to the Ninth Circuit's recent decision in *Alaska Right to Life Political Action Committee v. Feldman.*[109] We stated: "While pure legal questions that require little factual development are more likely to be ripe, a party bringing a pre[-]enforcement challenge must nonetheless present a concrete factual situation."[110] Looking back to *Brause* and its reliance on federal law, we reiterated the practical formulation for ripeness of pre-enforcement constitutional challenges to statutes: balancing the need for decision against the risks of decision.[111]

The plaintiffs in *ACLU of Alaska* had challenged a newly enacted statute criminalizing the possession of small amounts of marijuana, arguing that the statute was unconstitutional under *Ravin v. State.*[112] We first determined that because the plaintiffs faced federal prosecution for marijuana possession regardless of state law, the threat of the new law did not really create a hardship to them.[113] We then determined that concrete facts regarding the State's enforcement of

the new statute might aid in our decision.[114] We also considered the litigation's high-profile nature, with interest by both the legislative and executive branches, and that deference to the legislative branch prohibits us from declaring statutes unconstitutional unless "squarely faced with the need to do so."[115] Because of these factors, we concluded that the decisional risks outweighed the need for decision and that the plaintiffs therefore were not entitled to an exception from the general rule against pre-enforcement constitutional challenges to statutes.[116] We vacated the superior court's judgment in the plaintiffs' favor and dismissed the proceedings.[117]

The State and the Tribes disagree on *ACLU of Alaska*'s application here. The State implicitly characterizes this case as a pre-enforcement challenge to the 2004 Attorney General Opinion and asserts that the Tribes are asking "for a sweeping decision" despite the "factual vacuum of this case." The State argues the Tribes have not demonstrated a need for a decision, but the risk of decision is high because "jurisdictional analysis depends on [a variety of different] factual circumstances." The State points to a number of hypothetical fact patterns raising difficult questions and leading to differing results in the jurisdictional analysis, including if only one parent is a tribal member, if the parents are members of different tribes, and if one or both of the parents do not consent to tribal jurisdiction. It concludes that considering

---

**106.** 204 P.3d 364 (Alaska 2009).

**107.** *See id.* at 366 (concerning "pre-enforcement challenge to a newly amended statute that prohibits the possession and use of marijuana"); *id.* at 368 (looking to federal law); *see also Brause,* 21 P.3d at 358 (concerning request for declaration that statute denying same-sex marriages recognition is unconstitutional where challengers did not allege they had been denied any specific benefits); *id.* at 358–60 (relying in part on 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532, at 112, 114–15 (2d ed.1984)).

**108.** *ACLU of Alaska,* 204 P.3d at 366.

**109.** *Id.* at 368–69; *see Feldman,* 504 F.3d 840 (9th Cir.2007).

**110.** *ACLU of Alaska,* 204 P.3d at 368 (quoting *Feldman,* 504 F.3d at 849) (internal quotation marks omitted).

**111.** *Id.* at 369.

**112.** *Id.* at 366; *see Ravin,* 537 P.2d 494, 504, 511 (Alaska 1975) (holding Alaskans have fundamental right to privacy in their homes and allowing possession of small amounts of marijuana in home by adults for personal and private use).

**113.** *ACLU of Alaska,* 204 P.3d at 369–70.

**114.** *Id.* at 372–73.

**115.** *Id.* at 373.

**116.** *Id.* at 371–74.

**117.** *Id.* at 374.

the tribal jurisdiction question raised here in the absence of concrete facts "invites an inaccurate[,] broad[,] and unqualified jurisdictional ruling."

The Tribes respond that the State's argument rings hollow because the State contends that no Alaska Native tribe possesses *any* jurisdiction to initiate ICWA–defined child custody proceedings unless the tribe has reassumed jurisdiction under ICWA § 1918. The Tribes assert that this case does not raise an issue about tribal jurisdiction and authority over non-members and expressly ask us to refrain from addressing that issue. The Tribes point to the existence of tribal court systems and specific examples of the 2004 Attorney General Opinion's effect on tribal jurisdiction and powers,[118] and argue that there is a real case and controversy ripe for decision.

The Tribes distinguish *ACLU of Alaska* by observing that "the [c]ourt in *ACLU* was most influenced by the fact that the actions the plaintiffs sought to engage in, even if protected from criminalization under Alaska law, still remained criminal under federal law" and "[n]o analogue is present here." The Tribes also point out that "the [c]ourt in *ACLU* found that the plaintiffs' declarations did not indicate that the statute at issue would [a]ffect their conduct, or that they would be the subjects of enforcement," while "[h]ere, it is clear ... that the State is enforcing its new policies vigorously." The Tribes further note that "in *ACLU* a 'narrowing construction' of the new marijuana statute was possible, thus making adjudication of individual cases more appropriate; here, by contrast, the State's position is monolithic, barring *all* child protection proceedings from being initiated in tribal courts absent ...

reassumption ... and barring [recognition of] *all* tribal court adoption proceedings." (Emphasis in original.) The final distinction drawn by the Tribes is that "in *ACLU* due respect for the legislative branch required some hesitance on the [c]ourt's part before declaring an enacted statute unconstitutional," but "[h]ere, in contrast, state officials are taking actions based upon their interpretation of Alaska Supreme Court case law—a subject on which this [c]ourt is in the best position, and has an obligation, to decide."

The Tribes have the better argument. The State's actions in response to the 2004 Attorney General Opinion go beyond enacting a statute that might be challenged as facially unconstitutional. Indian children may be at risk of harm because of the State's refusal to coordinate and cooperate with tribes regarding reports of harm; Indian children, as well as their natural and putative adoptive parents, may be held in legal limbo by the State's refusal to give full faith and credit to tribal adoption decrees; and both the State and tribal courts need to understand the extent to which tribal court orders in "child custody proceedings," as that term is defined in ICWA, are entitled to full faith and credit. We agree with Judge Suddock: families and children are being affected; State and tribal relations are being affected; the State and Alaska Native tribes, as well as State and tribal courts, are being affected. Under our approach to ripeness in cases not involving pre-enforcement constitutional challenges to statutes, the Tribes have readily established the injury and threat of injury necessary to support this suit.[119]

We conclude that the legal issue before us has been sufficiently narrowed by our previous cases and the conflicting Ninth Circuit

---

118. The Tribes point out that based on the 2004 Attorney General Opinion, OCS changed its policy on recognizing existing tribal child custody proceedings, and that the record reflects one application of the new policy involving a member child of the Kenaitze Tribe. The child had been: (1) the subject of several emergency petitions before the Tribe; (2) the subject of multiple reports of harm OCS had transferred to the Tribe for follow-up; and (3) held by a state court to be under the tribal court's jurisdiction. OCS disregarded this previous activity and reopened its investigation, requesting a state court order compelling the child's attendance at an interview regarding allegations the Tribe had already investigated and found unsubstantiated. The

Tribes also point out that BVS stopped issuing birth certificates for children adopted in tribal courts shortly after the 2004 Attorney General Opinion was issued.

119. *See generally ACLU of Alaska*, 204 P.3d at 375–76 (Carpeneti, J., dissenting) ("We interpret standing, and by extension ripeness, leniently in order to facilitate access to the courts: 'The basic idea ... is that an identifiable trifle is enough for standing to fight out a question of principle.'" (quoting *State v. Planned Parenthood of Alaska*, 35 P.3d 30, 34 (Alaska 2001))); *Brause*, 21 P.3d at 360–61 (Bryner, J., dissenting) ("This court's standing jurisprudence indicates a willingness to

cases. There are enough facts before us to resolve the parties' fundamental jurisdictional dispute in limited fashion: We will decide whether—absent formal reassumption of jurisdiction under ICWA § 1918—Alaska Native tribes have inherent sovereign jurisdiction, concurrent with the State, to initiate ICWA–defined child custody proceedings. We therefore affirm Judge Suddock's decision denying the State's motion to dismiss the Tribe's suit and we decline to vacate the superior court judgment and dismiss this appeal on ripeness grounds.

### D. Today's Holding Regarding Alaska Native Tribal Sovereignty And ICWA

■ *John v. Baker* is foundational Alaska authority regarding Alaska Native tribal jurisdiction over the welfare of Indian children, notwithstanding the sharpness of the debate or the division of the court in reaching its ultimate conclusion.[120] Notably, the State does not ask that *John v. Baker* be overruled.

■ Having thoroughly outlined *John v. Baker*'s tribal jurisdiction analysis, we reiterate only the following four points from that decision to set the stage for our consideration of the State's arguments here. First, unless and until its powers are divested by Congress, a federally recognized sovereign Indian tribe has powers of self-government that include the inherent authority to regulate internal domestic relations among its members.[121] Second, ANCSA's elimination of nearly all Indian country in Alaska did not divest federally recognized sovereign Alaska Native tribes of their authority to regulate internal domestic relations among their members.[122] Third, we "must resolve ambiguities in statutes affecting the rights of Native Americans in favor of Native Americans" and "we will not lightly find that Congress intended to eliminate the sovereign powers of Alaska tribes." [123] Fourth, "Congress's purpose in enacting ICWA reveals its intent that Alaska Native villages retain their power to adjudicate child custody disputes" and "ICWA's very structure presumes both that the tribes ... are capable of adjudicating child custody matters ... and that tribal justice systems are appropriate forums for resolution of child custody disputes." [124]

The State contends that ICWA § 1911 constitutes a "complete jurisdictional scheme" limiting a tribe's initiating jurisdiction to child custody proceedings in Indian country under § 1911(a), but allowing, under certain conditions, transfer jurisdiction for those proceedings outside of Indian country under § 1911(b). According to the State, this scheme "reflects Congress'[s] reasonable balancing of tribal rights, parental rights off-reservation, and state rights off-reservation." The State argues that the superior court's acknowledgment of inherent sovereign jurisdiction to initiate child custody proceedings: (1) "fundamentally upend[s] ICWA's delicate balance of parental, state, and tribal interests"; (2) circumvents transfer jurisdiction limitations; (3) allows tribes to exercise jurisdiction over non-members; and (4) magnifies the disjunction in Indian law that P.L. 280 may have divested Alaska Native tribal pow-

---

adjudicate claims where the injury claimed is but 'an identifiable trifle.' " (quoting *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097 (Alaska 1988))).

120. The debate continued among commentators after the decision. *See, e.g.*, David M. Blurton, John v. Baker *and the Jurisdiction of Tribal Sovereigns Without Territorial Reach*, 20 Alaska L. Rev. 1, 26 (2003) (criticizing *John v. Baker*'s holding and interpreting United States Supreme Court cases to be "highly indicative ... that tribes, without Indian country, do not have inherent sovereign powers and lack criminal, civil adjudicatory, and regulatory authority"); Andy Harrington, *Exclusive of What? The Historical Context of the 1970 "Metlakatla" Amendment to PL 280*, 23 Alaska L. Rev. 1, 7–9, 30–32, 38–49 (2006) (criticizing *John v. Baker* dissent's conclu-

sion that 1970 amendment indicates P.L. 280 divested Alaska Native tribes of jurisdiction and taking position that (1) amendment was intended to supercede federal case law holding Metlakatla Reservation was not in Indian country and (2) "exclusive" in P.L. 280 § 2(c) does not mean exclusive of tribal jurisdiction, but instead means exclusive of federal jurisdiction under the General Crimes and Major Crimes Acts, 18 U.S.C. §§ 1152, 1153).

121. *John v. Baker*, 982 P.2d at 751.

122. *Id.* at 753.

123. *Id.* at 752–53 (citing *In re F.P.*, 843 P.2d at 1219).

124. *Id.* at 753–54 (citing 25 U.S.C. § 1911).

ers inside Indian country but not outside it—as noted in *John v. Baker*, "generally, Indian nations possess greater powers in Indian country than they do outside it." [125]

The Tribes respond that: (1) ICWA was intended to give tribes more, not less, power and authority to protect the best interests of their children; (2) this case does not present the issues the State raises concerning tribal jurisdiction over non-members; and (3) the remaining vestige of *Nenana*'s divestiture interpretation of P.L. 280 should be overruled, thereby eliminating the alleged jurisdictional disjunction.

We agree with the Tribes. ICWA creates limitations on states' jurisdiction over ICWA–defined child custody proceedings, not limitations on tribes' jurisdiction over those proceedings.[126] And we acknowledge that in the nearly 25 years since our *Nenana* decision, our view of P.L. 280's impact on tribal jurisdiction has become the minority view—other courts and commentators have instead concluded that P.L. 280 merely gives states concurrent jurisdiction with tribes in Indian country.[127] What remains of *Nenana* must now be overruled. We adopt the view that P.L. 280 did not divest tribes of all

jurisdiction under § 1911(a), but rather created concurrent jurisdiction with the State.

■ Accordingly, in light of our foundational decision *John v. Baker*, ICWA, federal case law regarding Alaska Native tribal sovereignty, and the absence of express contrary Congressional intent, we hold that federally recognized Alaska Native tribes that have not reassumed exclusive jurisdiction under § 1918(a) still have concurrent jurisdiction to initiate ICWA–defined child custody proceedings, both inside and outside of Indian country. Necessarily, federally recognized Alaska Native tribes are entitled to all of the rights and privileges of Indian tribes under ICWA, including procedural safeguards imposed on states [128] and § 1911(d) full faith and credit with respect to ICWA–defined child custody orders to the same extent as other states' and foreign orders.[129]

■ We do not have before us sufficient facts to make determinations about specific limitations on inherent tribal jurisdiction over ICWA–defined child custody proceedings. The nature and extent of tribal jurisdiction in any particular case will depend upon a number of factors, including but not

**125.** *Id.* at 748 n. 46.

**126.** *See Holyfield*, 490 U.S. at 44–45, 109 S.Ct. 1597 (stating ICWA's purpose was "to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings" because "Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities" (emphasis in original)); COHEN'S HANDBOOK, note 16, above, at § 11.01[1], 820 n.2 ("This conclusion is inescapable from a reading of the entire statute, the main effect of which is to curtail state authority."); ICWA HANDBOOK, note 17, above, at 5 (observing ICWA was intended, in part, "to encourage tribal adjudication of child custody proceedings involving Indian children").

**127.** *See Kaltag Tribal Council*, 344 Fed.Appx. at 325 ("[N]either the ICWA nor [P.L.] 280 prevented the Kaltag court from exercising jurisdiction."); COHEN'S HANDBOOK, note 16, above, § 6.04[3][c], at 560–61 ("The nearly unanimous view among tribal courts, state courts and lower federal courts, state attorneys general, the Solicitor's Office for the Department of the Interior, and legal scholars, is that [P.L.] 280 left the inherent civil and criminal jurisdiction of Indian nations untouched." (footnotes omitted)); ICWA HANDBOOK, note 17, above, at 34 ("It has become clear ... that the retrocession provisions ... permit Indian tribes to reassume exclusive juris-

diction over their children domiciled in Indian country, but these tribes can exercise concurrent jurisdiction over their children along with state courts and can exercise transfer jurisdiction under § 1911(b)...."); CASE & VOLUCK, note 77, above, at 394 ("[I]t is now generally agreed that [P.L. 280] does not deprive tribes of concurrent jurisdiction."); *id.* at 390 n. 134 ("Retrocession does not seem to be required for tribal courts to exercise concurrent jurisdiction over child custody matters, because such jurisdiction was not surrendered to the state under P.L. 280.").

**128.** *See, e.g.,* 25 U.S.C. § 1912(a) (2000) (requiring notice to Indian tribes); 25 U.S.C. § 1911(b) (providing Indian tribes with right to petition for transfer to tribal court); *id.* at § 1911(c) (providing Indian tribes with right to intervene); *see generally* ICWA HANDBOOK, note 17, above, at 83–111.

**129.** *See John v. Baker*, 982 P.2d at 761–62 ("ICWA requires courts to extend full faith and credit to tribal court decisions involving 'child custody proceedings' as that term is defined by [ICWA]."). This case does not present a specific full faith and credit dispute and we do not need to discuss potential limitations on § 1911(d) full faith and credit. *See, e.g., Starr v. George*, 175 P.3d 50, 55–58 (Alaska 2008) (discussing due

limited to: (1) the extent of the federal recognition of a particular tribe as a sovereign; (2) the extent of the tribe's authority under its organic laws; (3) the tribe's delegation of authority to its tribal court; and (4) the proper exercise of subject matter and personal jurisdiction. Among the many issues we are not deciding today are: (1) whether, parallel to ICWA § 1911(b) transfer jurisdiction limitations, parents of Indian children might have the right to object to tribal jurisdiction; (2) the extent of tribal jurisdiction over non-member parents of Indian children; and (3) the extent of tribal jurisdiction over Indian children or member parents who have limited or no contact with the tribe. We therefore do not need to address the varied hypothetical situations posited by the State as creating difficult jurisdictional questions—we leave those for later determinations under specific factual circumstances.

### E. Our Decision's Impact On The Judgment For Declaratory And Injunctive Relief

Our ruling is more limited than the declaratory relief entered by Judge Tan, and we therefore vacate that portion of the declaratory judgment going beyond today's decision. Today's decision should clarify any confusion about jurisdiction that may be held by federally recognized Alaska Native tribes to initiate ICWA-defined child custody proceedings. We are confident the State's agencies will follow our clarifying ruling without the need for further injunctive relief, and out of respect for the executive branch we therefore vacate that portion of the judgment entering such relief (but without prejudice to the right of the Tribes to seek future relief if deemed necessary).

## V. CONCLUSION

The superior court's judgment is AFFIRMED in part and VACATED in part, as set forth above.

STOWERS, Justice, not participating.

process requirement for orders afforded § 1911(d) full faith and credit).