*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RICHARD HELLER, | ) | |
| | ) | Supreme Court No. S-13551 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-08-01193 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF REVENUE, | ) | No. 6849 - December 6, 2013 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: Andy Harrington, Alaska Legal Services Corporation, Fairbanks, and James J. Davis, Jr., Alaska Legal Services Corporation, Anchorage, for Appellant. Michele Kane, Assistant Attorney General, Juneau, and Ruth Bottstein, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, Stowers, and Maassen, Justices.

CARPENETI, Chief Justice.
WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.

## I.    INTRODUCTION

A member of the military moved to a new post in Alaska in June 2005. Two months later, he was deployed to Iraq. After 16 months of service in Iraq, he returned to Alaska in December of 2006. Shortly thereafter, he applied for the 2007 Permanent Fund Dividend (PFD), which is paid in recognition of the applicant's eligibility during 2006. The Department of Revenue denied his application. The service member filed an informal appeal and later a formal appeal with the Department, both of which were denied. The superior court affirmed the denial, concluding that the relevant statute required him to reside in Alaska for six months before claiming an allowable absence for military service and that the statute did not violate equal protection under the U.S. and Alaska Constitutions. The service member appeals. Because he was not eligible for the 2007 PFD under AS 43.23.008, and this statute is consistent with the requirements of the U.S. and Alaska Constitutions, we affirm the judgment of the superior court.

## II.    FACTS AND PROCEEDINGS

In June 2005 the U.S. Army assigned Richard Heller to the Headquarters Company of the 172nd Stryker Brigade, an Alaska-based unit. He arrived in Alaska on June 17, 2005. Upon arrival, Heller registered to vote, obtained an Alaska driver's license, and changed his military records to indicate Alaska residency. On August 14, 2005, Heller was deployed to Iraq. Although Heller's service in Iraq was initially scheduled to last one year, the army extended his stay an additional 120 days. Heller finally returned to Alaska on December 11, 2006.

In March 2007 Heller applied for a Permanent Fund Dividend to be paid in 2007 for the 2006 qualifying year.[1] Several months later, Heller received a letter from Alaska's Department of Revenue (the State) denying his application. The letter explained that pursuant to AS 43.23.008(b) Heller was not eligible for the PFD because he was not an Alaska resident for at least six consecutive months before leaving the state. Heller filed a request for informal appeal, arguing that the short duration of his stay in Alaska prior to leaving the state should not prevent him from receiving a PFD because his position in the Army required him to go to Iraq. A PFD technician denied Heller's appeal. However, the denial included several erroneous facts. It stated that Heller had arrived in Alaska on June 17, 2006, when he had actually arrived exactly one year earlier. It also stated that Heller had failed to obtain an Alaska driver's license, register to vote in Alaska, and register a vehicle in Alaska, when he had actually done all three. Pointing out these errors, Heller filed a request for a formal hearing.

The Office of Administrative Hearings held a formal hearing on December 27, 2007. Despite adopting Heller's corrected version of the facts, the administrative law judge denied Heller's appeal. The judge noted that under AS 43.23.008(a)(3), it is possible for a person serving in the armed forces to retain PFD eligibility while living in another state or country during the qualifying year. However, the judge went on to explain that a person can take advantage of this allowable absence provision only if he was an Alaska resident for at least 180 days immediately before leaving the state.[2] Because there is no exception for involuntary absences, and Heller

---

[1] The "qualifying year" for a given PFD is the year that immediately preceded January 1 of the year in which the PFD is paid. *See* AS 43.23.095(6). Thus, 2006 was the qualifying year for the 2007 PFD.

[2] *See* 15 Alaska Administrative Code (AAC) 23.163(b)(1) (2007).

was a state resident for at most 59 days before leaving for Iraq, the judge concluded that Heller was not entitled to the 2007 PFD.

Heller appealed to the superior court, which closely examined the issues and affirmed the administrative decision. Heller appeals, arguing that the superior court's decision relies on a misinterpretation of the statute. In the alternative, Heller asserts that if the superior court's reading of the statute is correct, and he is precluded from receiving a 2007 PFD, the statute violates equal protection under both federal and state law.

## III. STANDARD OF REVIEW

When the superior court acts as an intermediate appellate court, we independently review the merits of the underlying administrative decision.[3] The specific form our independent review takes is de novo review: We adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[4]

Heller contests an agency's interpretation of one of its governing statutes. Because the interpretation involves legislative intent rather than agency expertise, we apply independent review here as well.[5] But the specific form our independent review

---

[3]     *See State, Pub. Emps. Ret. Bd. v. Morton*, 123 P.3d 986, 988 (Alaska 2005) (citing *State, Dep't of Natural Res. v. Greenpeace, Inc.*, 96 P.3d 1056, 1061 (Alaska 2004)).

[4]     *See State v. Native Vill. of Tanana*, 249 P.3d 734, 737 (Alaska 2011) ("Under de novo review, we apply 'the rule of law that is most persuasive in light of precedent, reason, and policy.' " (quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001))); *Homer Electric Ass'n, Inc. v. City of Kenai*, 816 P.2d 182, 185 (Alaska 1991) ("Because the superior court acted below as an intermediate appellate court, we [do not defer] to its decision; rather, we review the case *de novo*." (citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987))).

[5]     *Morton*, 123 P.3d at 988 (quoting *Alaska Ctr. for the Env't v. Rue*, 95 P.3d (continued...)

takes is distinct from pure de novo review.  We apply the substitution-of-judgment standard.[6]  Under this standard, we again adopt the rule of law that is most persuasive in light of precedent, reason, and policy, but in doing so we give due deliberative weight "to what the agency has done, especially where the agency interpretation is longstanding."[7]

Constitutional interpretation presents questions of law that are subject to independent review under the de novo standard.[8]

## IV. DISCUSSION

### A. Heller Does Not Meet The Eligibility Requirements Of AS 43.23.008.

Alaska Statute 43.23.005(a) sets out the basic eligibility requirements for receiving a PFD.  In pertinent part, the statute requires that an applicant "was, at all times during the qualifying year, physically present in the state or if absent was absent only as

---

[5]     (...continued)
924, 926 (Alaska 2004)).

[6]     *Id*.  We have also referred to the substitution-of-judgment standard as the "independent judgment" standard.  *See Chugach Electric Ass'n, Inc. v. Regulatory Comm'n of Alaska*, 49 P.3d 246, 249-50 (Alaska 2002) (citing and quoting *Nat'l Bank of Alaska v. State, Dep't of Revenue*, 642 P.2d 811, 815 (Alaska 1982)).

[7]     *Chugach Electric*, 49 P.3d at 249-50 (quoting *Nat'l Bank of Alaska*, 642 P.2d at 815) (internal quotation marks omitted).

[8]     *Eagle v. State, Dep't of Revenue*, 153 P.3d 976, 978 (Alaska 2007) (citing *Laidlaw Transit, Inc. v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1023 (Alaska 2005)); *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 581 (Alaska 2007) (citing *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004)).

allowed in AS 43.23.008."[9]  Alaska Statute 43.23.008(a) enumerates the physical absences that are allowed.[10]  In pertinent part, it states:

> (a) Subject to (b) and (c) of this section, an otherwise eligible individual who is absent from the state during the qualifying year remains eligible for a current year permanent fund dividend if the individual was absent
>
> . . .
>
> (3) serving on active duty as a member of the armed forces of the United States . . . ;
>
> . . .
>
> (16) for any reason consistent with the individual's intent to remain a state resident, provided the absence or cumulative absences do not exceed
>
>> (A) 180 days in addition to any absence or cumulative absences claimed under (3) of this subsection . . . .[11]

Alaska Statute 43.23.008(b) provides:

> An individual may not claim an allowable absence under (a)(1)-(15) of this section unless the individual was a resident of the state for *at least six consecutive months immediately before leaving the state*.[12]

---

[9]    AS 43.23.005(a)(6).

[10]    In 2008 the legislature amended AS 43.23.008, Ch. 36, §§ 1-2, SLA 2008. The amendments are not substantively relevant to this case, but they caused the subsections to be numbered differently.  Because this dispute arose under the 2007 statute, we follow the numbering that existed prior to the 2008 amendment.

[11]    Former AS 43.23.008(a) (2007).

[12]    Former AS 43.23.008(b) (2007) (emphasis added).

The question before us is whether Heller may claim an "allowable absence" for the period of time he was away from Alaska, serving in Iraq.

Heller argues that he is entitled to simultaneously claim two allowable absences: an allowable absence under subsection (a)(3) for his military service, and an allowable absence under subsection (a)(16) "for any reason consistent with [his] intent to remain a state resident." He acknowledges that a person only claiming an allowable absence under subsection (a)(3) is subject to a prior residency requirement of six months. He also does not contest that because he did not move to Alaska until June 2005, he had only been an Alaska resident for two months before leaving the state.

However, Heller points to subsection (a)(16), under which he is entitled to an additional 180 days out of the state "for any reason consistent with [his] intent to remain a state resident."[13] Unlike subsection (a)(3), subsection (a)(16) is not subject to the six-month residency requirement. Heller argues that because the six-month requirement does not apply to absences under (a)(16), he should be able to apply subsection (a)(16)'s 180 days to the period immediately following his August 2005 departure for Iraq. In Heller's view, by the time he had exhausted those 180 days, he had already been a resident of the state for over six months, and was therefore eligible for subsection (a)(3)'s allowable absence for military service. Heller argues that he should be allowed to combine subsections (a)(3) and (a)(16) in this manner because, according to Heller, the statute's text and legislative history support his interpretation.

The State disagrees. It argues that Heller's interpretation ignores the plain language of the statute, renders language in the statute superfluous, and undermines the legislature's intent to limit the dividend to permanent residents. It points to the plain language of AS 43.23.008(b), which states that in order for an applicant to claim an

---

[13]    Former AS 43.23.008(a)(16)(A) (2007).

allowable absence under subsection (a)(3), he must have been "a resident of the state for at least six consecutive months immediately *before leaving the state*."[14]  The State observes that, contrary to the statute's explicit language, Heller's interpretation of the statute would allow him to claim the allowable absence even though he had been a resident for less than six months before leaving.

To resolve this dispute we must look to the language and purpose of the statute.  "The objective of statutory construction is to give effect to the intent of the legislature, with due regard for the meaning that the statutory language conveys to others."[15] We give unambiguous statutory language its ordinary and common meaning, but the "plain meaning" rule is not an exclusionary rule; we will look to legislative history as a guide to construing a statute's words.[16]  "The plainer the meaning of the statute, the more persuasive any legislative history to the contrary must be."[17]

In this case, the statute's language is reasonably clear.  It provides:

> An individual may not claim an allowable absence under (a)(1)-(15) of this section unless the individual was a resident of the state for at least six consecutive months immediately before leaving the state.[18]

---

[14]     AS 43.23.008(b) (emphasis added).

[15]     *City of Dillingham v. CH2M Hill Nw., Inc.*, 873 P.2d 1271, 1276 (Alaska 1994) (citing *Saunders Props. v. Municipality of Anchorage*, 846 P.2d 135, 138 n.4 (Alaska 1993)).

[16]     *Id.* (citing *N. Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 & n.7 (Alaska 1978)).

[17]     *Id.* (citing *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991)).

[18]     Former AS 43.23.008(b) (2007).

This section prohibits a PFD applicant from claiming an allowable absence under former AS 43.23.008(a)(1)-(15) if that person did not reside in the state for at least six consecutive months immediately before leaving the state. Heller's interpretation contradicts this language; it would allow him to claim an allowable absence under subsection (a)(3) even though he did not reside in Alaska for six consecutive months prior to leaving the state.

Heller seizes on the use of the word "resident" in former AS 43.23.008(b) and emphasizes that he meets the basic definition of a "resident" under the PFD statute because he intended to remain in Alaska indefinitely.[19] Heller's focus on the word "resident" is misleading. The allowable absences listed in AS 43.23.008 are exceptions to the "physically present" requirement of AS 43.23.005. And the specific language of subsection (b) makes clear that the requirement set out in this subsection concerns physical presence, which, in this case, serves as an important indicator of intent to remain

---

[19]    A "state resident" in the PFD context is defined as:

> an individual who is physically present in the state with the intent to remain indefinitely in the state under the requirements of AS 01.10.055 or, *if the individual is not physically present in the state, intends to return to the state and remain indefinitely* under the requirements of AS 01.10.055.

AS 43.23.095(7) (emphasis added). The PFD statute defines a state resident for PFD purposes as a person who meets the basic eligibility requirements of AS 01.10.055 as well as other PFD-specific requirements. It is permissible for Alaska to define a "resident" differently for purposes of PFD eligibility than for other purposes. *Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 942 (Alaska 2000) (" '[T]he residency requirement for PFD eligibility may differ from other residency requirements.' " (quoting *Brodigan v. Alaska Dep't of Revenue*, 900 P.2d 728, 733 n.12 (Alaska 1995))). In this case, there is no dispute about Heller's intent to remain in Alaska or whether he satisfies the preliminary requirement of AS 01.10.055. The dispute concerns Heller's qualifications under the PFD statute.

in Alaska. The words "immediately before leaving" in subsection (b) corroborate our understanding that persons claiming an absence under subsection (a)(3) must have a six-month period as a state resident. Heller's alternative reading of the statute is too strained for us to accept; the statute does not authorize a PFD claimant to briefly enter the state, physically "leav[e]" the state for the entire remaining portion of the six-month period (as Heller did — a period of over four months) and satisfy the six-month requirement from another location. The modifier "consecutive" in AS 43.23.008(b) further reinforces our reading; if subsection (b) were concerned solely with intent to remain in Alaska, and not at all concerned with physical presence, then the modifier "consecutive" would be unnecessary because the continuous nature of the intent is already required by the word "indefinitely" found in AS 43.23.095(7). While the word "resident" in AS 43.23.008(b) creates some ambiguity, the best reading of this provision requires an applicant to physically reside in the state for six consecutive months before he or she can claim an allowable absence under subsection (a)(3).[20]

Heller argues that the State's "fixation" on the "immediately before leaving the state" language is illogical in light of the legislature's clear intent to enable military personnel to simultaneously claim allowable absences from subsections (a)(3) and (a)(16). Heller is correct that the legislature clearly intended to enable military personnel

---

[20] The dissent suggests that today's opinion creates a requirement of "physical presence for six consecutive months" before a person can take an allowable absence, which "will come as a great surprise to the many high school graduates who take an out-of-state spring break or summer vacation before departing for a college outside Alaska." But this hypothetical scenario is not before the court. Moreover, our opinion nowhere requires six months of "continuous" physical presence as the dissent claims. The concept of residency does not preclude temporary absences as long as the intent to remain continues. Former AS 43.23.008(b) (2007).

to combine the two kinds of allowable absences. Subsection (a)(16) makes an individual's absence allowable if it was:

> (16) for any reason consistent with the individual's intent to remain a state resident, provided the absence or cumulative absences do not exceed
>
>> (A) 180 days *in addition to* any absence or cumulative absences claimed under (3) of this subsection.[21]

Under this subsection, an applicant may be absent for any amount of time due to military service, and in the same qualifying year, be absent "for any reason consistent with [his] intent to remain a state resident" as long as that additional absence does not exceed 180 days. Combining the subsections in this way enables an individual to be out of the state for the purpose of military service for nine months out of the year, and go on vacation out of Alaska for three months; as long as he intends to remain an Alaska resident, he remains eligible for a PFD.

But contrary to Heller's argument, the reading of the statute that the State endorses is not inconsistent with the legislature's intent to enable military personnel to combine absences under (a)(3) and (a)(16). Under the State's reading, an applicant may combine (a)(3) and (a)(16) in a single year. However, if the applicant claims under (a)(3), he must have resided in Alaska for at least six consecutive months before leaving the state. This reading does not give rise to internal inconsistency; rather, it evinces a legislative intent to treat long absences more stringently than short ones. Not only must a person absent for more than 180 days be absent due to a legislatively-approved purpose — that is, one of the purposes enumerated in subsections (a)(1)-(15) — but such an absence must be immediately preceded by at least six consecutive months of state residence.

---

[21] Former AS 42.23.008(a)(16) (2007) (emphasis added).

These more stringent requirements are consistent with the legislature's intent to limit payment of dividends to bona fide permanent residents.[22] The requirement that an applicant be a resident for at least six months before leaving helps to ensure that the applicant was not merely "passing through" before he left the state, but rather had a genuine desire to make Alaska his permanent home. Thus, there is nothing internally inconsistent or inherently illogical in requiring an applicant claiming under subsection (a)(3) to have been a resident for six months before leaving the state, even where that applicant also claims an absence under subsection (a)(16).

Heller next argues that legislative history supports his reading. Heller points to the legislative history of the 2003 amendment that lengthened the amount of time military personnel can be out of the state over and above absences for the purpose of military service. Before the amendment, those claiming a military absence under subsection (a)(3) were allowed only an additional 45 days out of the state under the "for any reason" provision of the statute.[23] As a result of the amendment, military personnel were allowed 180 days of allowable absence "for any reason," over and above time spent away for the purpose of military service.[24] As Heller notes, legislative history indicates that the measure grew, in part, from a desire to show gratitude to military personnel for their service by relaxing the requirements that apply to them.[25]

---

[22]     *See State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio*, 858 P.2d 621, 625 (Alaska 1993) (stating that the purpose of the subsection of AS 43.23.095 defining state residency in the PFD context is "to limit payment of dividends to permanent residents").

[23]     *See* ch. 69, §1, SLA 2003.

[24]     *See id.*

[25]     *See* Minutes, Sen. Fin. Comm. Hearing on S.B. 148, 23rd Leg., 1st Sess.
(continued...)

But in implementing that goal, the legislature nevertheless sought to limit payment of dividends to bona fide permanent residents. The legislature chose to extend by more than four months the allowable "for any reason" absence; it did not choose to exempt military personnel from the "six consecutive months" requirement of subsection (b).[26] The amended statute still requires that military personnel reside in Alaska for at least six consecutive months before claiming a military absence under subsection (a)(3). Heller has not pointed to anything in the legislative history that convinces us otherwise.

Heller is correct that the statute enables military personnel to claim subsection (a)(3) and subsection (a)(16) absences in combination. But claiming the absences in combination does not justify bypassing the "six consecutive months" requirement of subsection (b). Heller is not eligible to claim a subsection (a)(16) absence because he spent at most 59 days in Alaska before leaving for Iraq. In order to claim the subsection (a)(3) absence, the PFD applicant must have first demonstrated a bona fide intent to remain in Alaska by physically residing in the state for six consecutive months. We agree with the State that the time Heller spent in Iraq does not count toward the requirement of living in Alaska for six consecutive months. Thus, although Heller is

---

[25]    (...continued)
(Apr. 17, 2003) (testimony of Mark Riehle, staff to Sen. John Cowdery, bill sponsor, introducing bill and asking the Committee to co-sponsor the bill in order to demonstrate its "patriotic thank you to the members of the Reserves, the Guards, and those in active duty military").

[26]    *Compare* former AS 43.23.008(a)(14)(A) (2002) ("180 days if the individual is not claiming an absence under (1)-(13) of this subsection"), *with* former AS 43.23.008(a)(14)(A) (2003) ("180 days in addition to any absence or cumulative absences claimed under (3) of this subsection if the individual is not claiming an absence under (1), (2), or (4)-(13) of this subsection").

able to claim a subsection (a)(16) absence for the first 180 days he spent in Iraq, he does not satisfy the statutory eligibility requirements necessary to claim a PFD in 2007.

**B.     The Eligibility Requirements Of AS 43.23.008 Are Constitutional.**

Heller also argues that the State's interpretation of the PFD statute violates provisions of the U.S. and Alaska Constitutions.  Typically, in cases like this one, we have focused exclusively on Alaska's equal protection clause because it "is more protective of individual rights than the federal equal protection clause."[27]  In this case, we analyze the two provisions separately.  We take this opportunity to clarify how recent developments in the federal right-to-travel doctrine relate to the constitutional question posed in this case.  As explained below, we conclude that AS 43.23.008(b) is consistent with the requirements of the U.S. Constitution's equal protection clause and article I of the Alaska Constitution.

**1.     AS 43.23.008 does not violate the U.S. Constitution.**

Heller argues that the statute violates the equal protection clause of the U.S. Constitution by infringing on his constitutionally-protected right to travel, which includes the right to migrate between states.  He characterizes the allowable absence provision as a durational residency requirement that is aimed not at distinguishing between residents and non-residents, but rather at distinguishing between two categories of residents — those who are eligible to claim an allowable absence and those who are not.  The State responds that the statute furthers a legitimate state interest by ensuring that only bona fide residents receive dividends and is therefore constitutional. It distinguishes the cases invalidating durational residency requirements cited by Heller on two grounds: First, none of those cases concerned a state's use of a residency

---

[27]     *See Underwood v. State*, 881 P.2d 322, 324-25 (Alaska 1994) (quoting *State v. Anthony*, 810 P.2d 155, 157 (Alaska 1991)) (internal quotation marks omitted).

requirement to verify that an individual is a bona fide resident; and second, those cases did not involve readily portable benefits that are at high risk of abuse. We agree with the State.

Heller is correct that some durational residency requirements have been used to effect unconstitutional discrimination against newcomers.[28] Unconstitutional discrimination has taken the forms of burdening new residents[29] and favoring previously established ones.[30] And the fact that a discriminatory residency requirement is part of a statutory scheme that provides some benefits to new residents does not by itself spare that statute from scrutiny.[31] But not all residency requirements are constitutionally

---

[28] *See, e.g.*, *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 614, 622-24 (1985). The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits states from burdening the right to travel without adequate justification. *Id.* at 618 & n.6. The right to interstate travel encompasses the right of new residents to establish residency in a new state and be treated equally under the laws of that state. *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) ("[O]ur recent [right-to-travel] cases have dealt with state laws that, by classifying residents according to the time they established residence, resulted in the unequal distribution of rights and benefits among otherwise qualified bona fide residents."). The equal-protection guarantee in article I of the Alaska Constitution implicates a similar analysis, which is considered in Part IV.B.2.

[29] *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 331, 336, 360 (1972) (invalidating under U.S. Constitution durational residency requirement that prevented new Tennessee residents from exercising their right to vote for one year).

[30] *See, e.g.*, *Hooper*, 472 U.S. at 622-24.

[31] *Cf. Saenz v. Roe*, 526 U.S. 489 (1999) (invalidating California law under which the maximum welfare benefits available to residents of less than one year was capped at the level of benefits they had been entitled to in their previous state of residence)*; Zobel v. Williams*, 457 U.S. 55, 57-58, 65 (1982) (invalidating PFD plan under which each adult resident received one dividend unit benefit for each year of residency after 1959).

infirm.[32] We must distinguish between, on the one hand, residency requirements that treat residents differently from nonresidents, and on the other hand, durational residency requirements that treat new residents differently from established ones.[33]

A "durational residency requirement" is a waiting period. This term is also used to describe laws, including waiting periods, that draw distinctions between old and new residents. "Generally, a state has much more authority to draw distinctions between residents and nonresidents than between long- and short-term residents."[34] Thus, durational residency requirements are more susceptible to constitutional infirmity than laws that distinguish residents from nonresidents.[35] But we hesitate to attach much importance to this label because it can be easily misapplied. While the term "durational

---

[32] *See, e.g.*, *Sosna v. Iowa*, 419 U.S. 393, 395, 410 (1975) (upholding Iowa's one-year durational residency requirement for filing a divorce action).

[33] *See Soto-Lopez*, 476 U.S. at 904 n.3 ("We have always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and nonresidents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State." (citing among others *Martinez v. Bynum*, 461 U.S. 321, 325-30 (1983))); *Gilman v. Martin*, 662 P.2d 120, 125 (Alaska 1983) ("The right to interstate or intrastate travel is impinged upon only when a governmental entity creates distinctions between residents based upon the duration of their residency, and not when distinctions are created between residents and nonresidents.").

[34] *Williams v. Zobel*, 619 P.2d 448, 451 n.7 (Alaska 1980) (citing *Vlandis v. Kline*, 412 U.S. 441, 452-53 (1973); *Fisher v. Reiser*, 610 F.2d 629, 635 (9th Cir. 1979)), *rev'd on other grounds by Zobel v. Williams*, 457 U.S. 55 (1982).

[35] *But see Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 256 (1974) (clarifying that prior holding did not imply that durational residency requirements are per se unconstitutional); *State v. Adams*, 522 P.2d 1125, 1127 (Alaska 1974) ("We do not hereby decide that all durational residency requirements are ipso facto unconstitutional.").

residency requirement" may be a useful shorthand in some cases, the key to assessing a residency requirement's constitutionality is identifying its purpose.[36] We must determine whether a residency requirement was designed to establish the bona fides of a person's intent to remain in the state.[37]

For purposes of the PFD, AS 43.23.095(7) defines "state resident" as "an individual who is physically present in the state with the intent to remain indefinitely in the state under the requirements of AS 01.10.055." In turn, AS 01.10.055 provides that the "intent to remain" required to establish residency is demonstrated "by maintaining a principal place of abode in the state for at least 30 days *or for a longer period if a longer period is required by law or regulation*" and "by providing other proof of intent *as may be required by law or regulation.*"[38] As such, there is no consistent code-wide definition of what it means to be a "resident."

Indeed, the legislature has defined "resident" differently for different purposes in another section of the Alaska Statutes, and has done so just as it did in regard to defining resident for purposes of PFD eligibility: by using the allowable absence provision of AS 43.23.008 to distinguish between residents and non-residents. At the

---

[36]     *Cf. Brodigan v. Alaska Dep't of Revenue*, 900 P.2d 728, 734 n.13 (Alaska 1995) (evaluating constitutionality of PFD residency requirement by balancing "the nature and extent of the infringement on [the right to travel] caused by the classification against the state's purpose in enacting the statute and the fairness and substantiality of the relationship between that purpose and the classification," and concluding "the State's purpose in awarding PFDs only to permanent residents outweighs the minor infringement" on the applicants' right to travel).

[37]     *Cf. Martinez*, 461 U.S. at 325-30 (reasoning that whether disputed statute was designed to distinguish bona fide residents from nonresidents was "central question" in evaluating its constitutionality under the right-to-travel doctrine).

[38]     AS 01.10.055(b)(1)-(2) (emphasis added).

same time that it adopted the amendments that are the subject of this dispute, the legislature amended the section of the Public Employment Relations Act defining residency as follows:

> (e) In this section, "state resident" means an individual who is physically present in this state with the intent to remain permanently in the state under the requirements of AS 01.10.055 *or, if the individual is not physically present in the state, intends to return to the state and remain permanently in the state under the requirements of AS 01.10.055 and is absent only temporarily for reasons allowed under AS 43.23.008 or a successor statute.*[39]

Here, the legislature defined "state resident" as an individual who meets the requirements set out in AS 01.10.055 and is either physically present in the state *or* temporarily absent under the allowable absence provision, AS 43.23.008. This shows that the allowable absence provision was intended to distinguish between residents and nonresidents. The legislature clearly contemplated allowing for varying residency requirements depending on the context — requiring longer periods of physical presence for some purposes than for others.[40]

Determining eligibility for the allowable absence provision of the PFD statute is one such purpose. The PFD program is particularly susceptible to passers-through establishing minimal ties to Alaska while intending to reside elsewhere.[41] As

---

[39]     Ch. 44, § 1, SLA 1998 *codified at* AS 23.40.210(e) (emphasis added).

[40]     *See* AS 01.10.055.

[41]     The dissent claims that "[i]t would not be unduly burdensome for the State to determine on an individualized basis whether an applicant relying on an allowable absence provision is in fact a bona fide resident." But the State must now process nearly 700,000 applications every year. *See* State of Alaska Department of Revenue, Permanent Fund Dividend Division, *2012 Annual Report* 8 (2012) ("In total, the division received
(continued...)

the United States Supreme Court has recognized, the risk of distributing benefits to nonresidents grows if the benefits are "readily portable."[42] The PFD is a highly portable cash benefit that can be spent anywhere; and the payment is administered on a one-time, annual basis regardless of income limits, making it a particularly attractive target for abuse.[43] The allowable absence provision magnifies this portability, allowing individuals who leave the state for certain purposes to retain their PFD eligibility.[44]

Moreover, unlike the welfare benefits or voting rights at issue in *Saenz v. Roe* and *Dunn v. Blumstein*, the PFD program is unique to Alaska. By establishing a new state of residency for purposes of voting or welfare benefits, a person gives up the right to vote or collect welfare benefits in the prior state of residence. But individuals who come to Alaska to collect a PFD do not give up a permanent-fund cash payment

---

[41]     (...continued)
679,106 applications in 2012."). An applicant can accumulate tax, school, voter registration, and motor vehicle registration records in a short time — as shown in the present case. And an applicant's intent to return can be accurately assessed only in hindsight in many cases. Thus, contrary to the dissent's assertion, it would be quite burdensome for the State to determine bona fide residency on an individualized basis.

[42]     *Saenz v. Roe*, 526 U.S. 489, 505 (1999).

[43]     *See Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 946 n.30 (Alaska 2000).

[44]     *See* AS 43.23.008 (listing situations where individual who is absent from the state remains eligible for PFD). Moreover, once an individual has qualified for the PFD and is absent from the state under the allowable absence provision, he or she can continue to collect the PFD for up to 10 years without spending any significant period of time in Alaska. *See* AS 43.23.008(c) ("An otherwise eligible individual who has been eligible for the immediately preceding 10 dividends despite being absent from the state for more than 180 days in each of the related 10 qualifying years is only eligible for the current year dividend if the individual was absent 180 days or less during the qualifying year."); AS 43.23.005(a)(4) (requiring otherwise-eligible applicants to spend 72 consecutive hours in Alaska during the prior two years).

from another state. Alaska's economy is a magnet for seasonal workers and other visitors who may stay just long enough to establish paper ties in Alaska.[45] In this context, physically residing in the state for six consecutive months is not an excessively long requirement to establish the bona fides of PFD claimants before they depart the state — often for lengthy periods of time.

The legislative history supports the conclusion that AS 43.23.008(b) was enacted to ensure that only bona fide residents receive the PFD. The six-month requirement represents the legislature's attempt to "prevent[] someone from coming into the state for a few days, declaring residency, and then immediately claiming an allowable absence."[46] Comments from several lawmakers during legislative meetings on the 1998 amendments to the PFD statute reflect general concerns regarding fraud and abuse from out-of-state applicants — particularly those in the military — and the difficulty of determining whether an applicant has a genuine intent to remain in Alaska.[47] The

---

[45]    *See* STATE OF ALASKA, DEP'T OF LABOR & WORKFORCE DEV., NONRESIDENTS WORKING IN ALASKA 2009 (2011), *available at* http://labor.alaska.gov/research/reshire/NONRES.pdf.

[46]    Testimony of Tom Williams, legislative aide, Tape SFC-98-24, Hearing on H.B. 2 Before Sen. Finance Comm., 20th Leg., 2d Sess. (Feb. 9, 1998).

[47]    *See* Testimony of Sen. Dave Donley at #154, Tape SFC-97, Hearing on H.B. 2 Before Sen. Finance Comm., 20th Leg., 1st Sess. ( May 7, 1997) (expressing concern regarding fraud and abuse from out-of-state applicants and describing fraud as a "serious problem" that was "very difficult to police"); Testimony of Sen. Jerry Mackie at #6, Tape SSAC-97, Hearing on H.B. 2 Before Sen. State Affairs Comm., 20th Leg., 1st Sess. (Feb. 20, 1997) (expressing concern regarding military personnel who come to Alaska for a short period of time, then leave "with probably no intention of returning," but remain eligible for the PFD); Testimony of Rep. Pete Kott at #6, Tape SSAC-97, Hearing on H.B. 2 Before Sen. State Affairs Comm., 20th Leg., 1st Sess. (Feb. 20, 1997) (characterizing intent as a "difficult issue" and "the heart of the problem" of determining

(continued...)

legislative history also demonstrates that lawmakers were aware that the residency statute[48] contemplated allowing other statutes, such as the PFD statute, to include additional tests for residency.[49] Given the concerns regarding abuse and the difficulty in determining the bona fides of an applicant's declared intent to remain, the six-month requirement was enacted in an attempt to distinguish residents from nonresidents.

A comparison to the earlier version of the PFD statute is also instructive. Before 1998, PFD claimants were required to demonstrate their bona fide intent to remain in Alaska by remaining physically in the state unless absent for a legislatively approved purpose and length of time.[50] Under the former statute, the list of legislatively approved absences was incorporated into the definition of "state resident."[51] And there is no dispute that the former statutory scheme — with its residency requirements — was consistent with the right-to-travel doctrine.[52] The 1998 amendment created an

---

[47]     (...continued) residency for out-of-state applicants such as members of the military or students).

[48]     AS 01.10.055.

[49]     Testimony of Rep. Bettye Davis, Tape No. HFC-97-15, Hearing on H.B. 2 Before House Finance Comm., 20th Leg., 1st Sess. ( Jan. 30, 1997).

[50]     *See* former AS 43.23.095(8) (1997); 15 AAC 23.163(c) (1997).

[51]     *See* former AS 43.23.095(8) (1997).

[52]     *See Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1131 (Alaska 1999), ("[T]he PFD regulations and statutes in question are bona fide requirements which ensure that benefits 'provided for residents are enjoyed only by residents,' and as such do not violate the constitutional right of interstate travel." (quoting *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904 n.3 (1986))).

"allowable absence" provision, separate from the definition of "state resident."[53] It is significant that the substance of the amended statute mirrored the substance of the earlier statute and regulations.[54]

Heller acknowledges that the 1998 amendment was only designed to effect "technical changes." Nevertheless, he goes on to argue that the amendment renders the statute unconstitutional because, following the amendments, a person could meet the minimum requirements for being a resident spelled out in AS 43.23.095 but remain ineligible for a PFD as a result of the allowable absence provision in AS 43.23.008(a).[55] We cannot agree with Heller's analysis.

It is well established that "the residency requirement for PFD eligibility may differ from other residency requirements."[56] Eligibility for the PFD includes meeting a definition of residency tied to physical contact to the state, which may be more difficult to meet than the definition of residency for other purposes.[57] Other provisions set out threshold requirements for being a state "resident,"[58] while AS 43.23.008(b) sets out a requirement specific to PFD applicants who spend a substantial period of time

---

[53]     Ch. 44, §§ 5, 7, SLA 1998.

[54]     *Compare* former AS 43.23.008 (1999), *with* former AS 43.23.095(8) (1997), *and* 15 AAC 23.163(c) (1997); *see also Church*, 973 P.2d at 1127-28 & n.2 (interpreting pre-1998 statute and regulations).

[55]     *See* former AS 43.23.008 (2007).

[56]     *Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 942 (Alaska 2000) (quoting *Brodigan v. State, Dep't of Revenue*, 900 P.2d 728, 733 n.12 (Alaska 1995)) (internal quotation marks omitted); *see also Church*, 973 P.2d at 1129.

[57]     *Compare* AS 43.23.008, *with* AS 01.10.055.

[58]     *See* AS 01.10.055.

residing outside of state borders.[59] Far from singling out newcomers for additional burdens,[60] this provision was designed to make sure that PFDs — highly portable cash payments sent once a year — went only to state residents.[61] Like its predecessor,

[59] We recognize that although "[t]here is a presumption that the same words used twice in the same act have the same meaning," *Jonathan v. Doyon Drilling, Inc.*, 890 P.2d 1121, 1124 (Alaska 1995) (quoting *Kulawik v. ERA Jet Alaska*, 820 P.2d 627, 634 (Alaska 1991)), "it is possible to interpret an imprecise term differently in two separate sections of the statute which have different purposes." 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 64:6 (7th ed. 2008). As we have noted, the term "resident" is by definition imprecise, because it requires "maintaining a principal place of abode in the state for at least 30 days *or for a longer period if a longer period is required by law or regulation.*" AS 01.10.055. (Emphasis added.) And the two provisions under discussion have different purposes: one determines eligibility for the PFD while the other determines eligibility for the allowable absence provision. As such, it is consistent with statutory principles of construction to assign different meanings to the term "resident" in different sections of the PFD statute. Finally, here these different meanings are compelled by the convincing evidence of legislative intent described above.

[60] New residents who have not fulfilled the six consecutive months requirement of AS 43.23.008(b) are not the only Alaska residents ineligible for PFDs. Previously established residents may be ineligible for a given year's PFD if during the qualifying year they fail to comply with the allowable absence provisions, by, for example, staying out of state for more than 45 days without claiming any absences under subsection (a)(1)-(16). A long-standing resident may be ineligible for a PFD for failure to submit required proof of eligibility or for failure to comply with the requirements of other state or federal laws. *See* AS 43.23.005(a)(1), (a)(7), (d) (2007).

[61] *Cf. Church*, 973 P.2d at 1130 (considering six-month restriction on allowable absences in earlier PFD statute and concluding "[t]he objective of the challenged statutes and regulations is to ensure that only permanent residents receive dividends" (citing *Brodigan*, 900 P.2d at 732)).

therefore, the current PFD statute sets out "bona fide requirements which ensure that benefits 'provided for residents are enjoyed only by residents.' "[62]

The WWAMI program, a collaborative medical school program among universities in Washington, Wyoming, Alaska, Montana, and Idaho and the University of Washington School of Medicine, employs a similar eligibility scheme. Alaska WWAMI participants "must maintain at all times an intent to return to [Alaska] upon completion of the program" and must have physically resided in Alaska for at least two consecutive years prior to beginning the program, subject to an allowable absence provision — which also requires two consecutive years of physical residence immediately prior to the absence.[63]

Because the statute is a bona fide residency requirement, rational basis review is the appropriate level of scrutiny. While some residency requirements have

---

[62]    *Id*. at 1130 (quoting *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904 n.3 (1986)) (interpreting pre-1998 PFD statute and regulations).

[63]    *See* 20 AAC 19.030(a) (2012); *see also* 20 AAC 18.020 (2012) (restricting eligibility for the Professional Student Exchange program to state residents, and stating "[f]or purposes of this section, a person is a resident of the state if that person physically resides in the state and maintains a domicile in the state during the 12 consecutive months before the date of application for certification[,]" subject to an allowable absence provision that also requires prior 12-month period of physical residence).

warranted strict scrutiny,[64] others have been subject to a less stringent form of review.[65] The United States Supreme Court's most recent case on the topic, *Saenz v. Roe*,[66] applied heightened scrutiny to a durational residency requirement affecting eligibility for welfare benefits.[67] Although *Saenz* suggested that all durational residency requirements are subject to heightened scrutiny,[68] the Court recognized the continuing validity of earlier

---

[64]     *See, e.g.*, *Soto-Lopez*, 476 U.S. at 904-06 (applying heightened scrutiny to statutory civil-service preference for veterans who entered armed forces while residing in New York); *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250 (1974) (reviewing one-year residency requirement on indigent medical care); *Dunn v. Blumstein*, 405 U.S. 330 (1972) (reviewing one-year residency requirement on voting); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (reviewing one-year residency requirement on welfare-benefit eligibility).

[65]     *See, e.g.*, *Martinez v. Bynum*, 461 U.S. 321, 328 n.7, 333 (1983) (upholding residency requirement on public school access under rational-basis review); *Sosna v. Iowa*, 419 U.S. 393, 395 (1975) (upholding Iowa's one-year durational residency requirement for filing a divorce action); *Vlandis v. Kline*, 412 U.S. 441, 452 (1973) ("Nor should our decision be construed to deny a State the right to impose on a student, as one element in demonstrating bona fide residence, a *reasonable* durational residency requirement, which can be met while in student status.") (emphasis added); *Sturgis v. Washington*, 368 F. Supp. 38 (W.D. gWash. 1973) (upholding one-year residency requirement for tuition under rational-basis test), *aff'd summarily by Sturgis v. Washington*, 414 U.S. 1057 (1973); *Starns v. Malkerson*, 326 F. Supp. 234 (D. Minn. 1971) (upholding one-year waiting period on in-state tuition eligibility under rational-basis test), *aff'd summarily by Starns v. Malkerson*, 401 U.S. 985 (1971).

[66]     526 U.S. 489 (1999).

[67]     *See id.* at 492, 504, 511 ("Neither mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that discriminates against some of its citizens because they have been domiciled in the State for less than a year.").

[68]     *Id.* (describing the application of strict scrutiny to discriminatory residency requirements as "categorical").

cases that had applied lower levels of scrutiny to distinguishable residency requirements.[69] In fact, *Saenz* carefully distinguished cases like this one, where the challenged statute is designed to verify bona fide residency, from cases falling under the general rule of heightened scrutiny.[70] In *Schikora* we took up the question that *Saenz* did not resolve and made clear that rational basis review applies to classifications which distinguish bona fide residents from nonresidents.[71] We conclude that AS 43.23.008(b) is consistent with constitutional requirements because the statute directly advances a state interest that is undoubtedly "legitimate."[72]

> **2.    AS 43.23.008 does not violate the equal protection clause of the Alaska Constitution.**

---

[69]    *Saenz*, 526 U.S. at 505 (citing *Sosna*, 419 U.S. at 395; *Vlandis*, 412 U.S. at 441). For further discussion on the level of scrutiny, compare *Soto-Lopez*, 476 U.S. at 904-06 (applying heightened scrutiny), with *id.* at 913 (Burger, C.J., concurring) (urging an initial rational basis analysis and concluding that challenged statute fails even that test), and *id.* at 916 (White, J., concurring) (concluding that challenged statute was irrational).

[70]    *See Saenz*, 526 U.S. at 505 ("We . . . have no occasion to consider what weight might be given to a citizen's length of residence if the bona fides of her claim to state citizenship were questioned.").

[71]    *See Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 946 n.30 (Alaska 2000).

[72]    *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972) ("The State's legitimate purpose is to determine whether certain persons in the community are bona fide residents."). Indeed, the State's interest is probably "substantial." *Soto-Lopez*, 476 U.S. at 904 n.3 ("A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement . . . generally . . . does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there." (citing *Martinez v. Bynum*, 461 U.S. 321, 328-39 (1983))).

For many of the same reasons discussed above, AS 43.23.008 does not violate the Alaska Constitution. But we follow a slightly different approach under our state constitution. "In analyzing a challenged law under Alaska's equal protection provision, we first determine what level of scrutiny to apply, using Alaska's 'sliding scale' standard."[73] "The 'weight [that] should be afforded the constitutional interest impaired by the challenged enactment' is 'the most important variable in fixing the appropriate level of review.' "[74]

According to Heller, the six-month residency requirement is an impermissible burden on his constitutionally-protected rights to travel, to engage in an economic endeavor within a particular field, to be free from a penalty upon short-term residents, and to keep and bear arms. Consequently, Heller contends, the requirement triggers heightened scrutiny under Alaska's equal protection clause.

The State responds that because the dividend is an economic interest, AS 43.23.008(b) only warrants minimum scrutiny under Alaska's equal protection test. The State goes on to assert that the statute bears a fair and substantial relationship to accomplishing the legitimate objective of limiting payments to bona fide residents, and therefore does not violate equal protection under the state constitution.

We agree with the State. We have applied our constitutional balancing test to similar residency requirements in the past, and found them to be constitutional.[75] We

---

[73]     *State v. Planned Parenthood of Alaska*, 28 P.3d 904, 909 (Alaska 2001) (citing *Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 396 (Alaska 1997)).

[74]     *Id.* (quoting *Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 269 (Alaska 1984)).

[75]     *See Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1127-28 (Alaska (continued...)

have noted that the PFD is an economic interest that does not usually warrant strict scrutiny,[76] but that is not the only factor in the analysis. It is important that the burdens on the alleged rights in this case are minimal: The six-month requirement does not bar residents from traveling for shorter periods of time under the AS 43.23.008(a)(16) allowance absence provision, nor does it prevent bona fide residents from spending time out of state once they have satisfied the six-month period of AS 43.23.008(b). Assuming that the right to work in an economic endeavor in a particular field is implicated in this case, we conclude that the six-month requirement does not prevent Heller from employment in the military; it simply provides that before military personnel can claim state resources through the PFD program, they must spend six months in state.

Nor do we find merit in Heller's argument that AS 43.23.008(b) burdens other interests of his.[77] As we said in *Church v. State*, "[A]llowing only enumerated

_____

[75] (...continued) 1999) (reviewing PFD denial that was based on claimant having spent more than 180 days out of state caring for dying relative); *Brodigan v. State, Dep't of Revenue*, 900 P.2d 728, 730-31 & n.7 (Alaska 1995) (upholding PFD denial where claimants' extended absence from Alaska supported Department's finding that they lacked "intent to remain permanently in the state"); *see also Cousins v. State, Dep't of Revenue*, Mem. Op. & J No. 1026, 2001 WL 34818200, at *1-2 (Alaska, May 9, 2001) (upholding PFD denial where claimants were absent from Alaska for longer period than was authorized by allowable absence provisions).

[76] *Church*, 973 P.2d at 1130 (citing *State v. Anthony*, 810 P.2d 155, 158 (Alaska 1991)).

[77] We find no merit in Heller's contention that AS 43.23.008 burdens his right to bear arms under the Second Amendment of the U.S. Constitution. Heller argues that the constitutionally-protected right to bear arms encompasses a right to serve in the U.S. military, but the cases Heller cites — *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020 (2010) (incorporating Second Amendment against states); *District of Columbia v. Heller*, 554 U.S. 570, 598-601 (2008) (invalidating District of Columbia gun restrictions);
(continued...)

excusable absences unless a person has been in the state more than half a year bears a fair and substantial relationship to ensuring that the dividend goes only to permanent residents."[78]

## V. CONCLUSION

Because Heller is not eligible for the 2007 PFD under AS 43.23.008, and because this statute is consistent with the requirements of the United States and Alaska Constitutions, we AFFIRM the judgment of the superior court.

---

[77]     (...continued)

*United States v. Miller*, 307 U.S. 174, 178-82 (1939) (describing historical roots of Second Amendment) — do not involve military service. To the extent that Heller raises a distinct "right-to-travel" argument under the privileges and immunities clause of the U.S. Constitution, we decline to address it for inadequate briefing. *See Martinson v. Arco Alaska, Inc.*, 989 P.2d 733, 737-38 (Alaska 1999) (arguments inadequately briefed are waived).

[78]     *Church*, 973 P.2d at 1130-31.

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.

I agree with the court's determination that Richard Heller did not meet AS 43.23.008(b)'s eligibility requirements for an allowable absence from Alaska in 2006.[1] But I disagree with the court's determination that AS 43.23.008(b) is a bona fide residency requirement and thus does not violate the United States Constitution. In my view AS 43.23.008(b) is an unconstitutional durational residency requirement, and I therefore would reverse the superior court's decision and order that Heller is qualified to receive a Permanent Fund Dividend (PFD) for 2007 (based on his 2006 qualifying year of residency).[2]

We must carefully distinguish between bona fide residency requirements, which treat residents differently from nonresidents, and durational residency requirements, which treat new residents differently from established residents.[3] As the court correctly states today, "durational residency requirements are more susceptible to constitutional infirmity than laws that distinguish residents from nonresidents."[4] If a

---

[1]       As the court notes at Op. 6, n.10, in 2008 the legislature amended AS 43.23.008. *See* Ch. 36, §§ 1-2, SLA 2008. Although not substantively relevant to this case, the amendments caused the subsections to be numbered differently. Because this dispute arose under the 2007 statute, I, like the court, follow the numbering existing prior to the 2008 amendment.

[2]       Because I conclude that the statute violates the United States Constitution, I do not address whether it also violates the Alaska Constitution.

[3]       *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 n.3 (1986) ("We have always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and nonresidents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State.").

[4]       Op. at 16. *Compare Soto-Lopez*, 476 U.S. at 904-05 & n.4 (stating
(continued...)

durational residency requirement burdens the right to migrate,[5] under federal constitutional analysis the State of Alaska is required to show that the law is necessary to further a compelling state interest.[6]

The distinction between a bona fide residency requirement and a durational residency requirement does not depend merely on the requirement's purpose. If it actually, purposely, or incidentally burdens the right to migrate, a state residency requirement discriminating against citizens who have been residents for a relatively short period is a durational residency requirement subject to strict scrutiny.[7] The United States

---

[4]    (...continued)
durational residency requirement burdening right to migrate is subject to strict scrutiny), *with Martinez v. Bynum*, 461 U.S. 321, 328 n.7 (1983) ("A bona fide residence requirement implicates no 'suspect' classification, and therefore is not subject to strict scrutiny.").

[5]    The right to travel, or "the right of free interstate migration," is "a basic right under the Constitution" and "includes the freedom to enter and abide in any State in the Union." *Soto-Lopez*, 476 U.S. at 901-02 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972)) (internal quotation marks omitted); *see also* Laurence H. Tribe, *Saenz Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future — or Reveal the Structure of the Present?*, 113 HARV. L. REV. 110, 149-50 (1999):

> [T]he [right to travel] cases appear to stand for a principle according to which those benefits of living in a given state that are constitutive of state citizenship and that may accordingly be restricted to the state's own citizens may not be still further restricted so that some citizens, based solely on the duration or pedigree of their citizenship, are in effect treated as "more equal than others."

[6]    *Soto-Lopez*, 476 U.S. at 904-05 & n.4.

[7]    *See id.* at 903 (stating Supreme Court's cases have "principally involved" indirect burdening of right to migrate, but "[a] state law implicates the right to travel when" it actually, purposely, or indirectly deters such travel); *State v. Adams*, 522 P.2d
(continued...)

Supreme Court more recently has stated that because "the right to travel embraces the citizen's right to be treated equally in [a] new State of residence, the discriminatory classification is itself a penalty," regardless of actual or incidental deterrence to migration, and thus subject to strict scrutiny review.[8]

It is against this backdrop that AS 43.23.008(b) must be considered. I start with the unremarkable proposition laid out by the court that the legislature may define "resident" differently for PFD eligibility than for other purposes.[9] I then look to see how the legislature actually defined "resident" for PFD eligibility when Heller applied for a 2007 PFD. Prior to statutory amendments in 1998, the list of legislatively approved absences was incorporated in the definition of "resident"[10] and, as the court notes, that definition had passed constitutional muster.[11] But, as the court also notes, the legislature

---

[7]      (...continued)
1125, 1131 (Alaska 1974) ("In our view, the nature of the benefit withheld by the state is relevant only to judging the relative importance of the competing state interest, not to determining the applicable standard of judicial review.").

[8]      *Saenz v. Roe*, 526 U.S. 489, 504-05 (1999).

[9]      Op. at 9, n.19 (quoting *Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 942 (Alaska 2000) (" '[T]he residency requirement for PFD eligibility may differ from other residency requirements.' ") (quoting *Brodigan v. Alaska Dep't of Revenue*, 900 P.2d 728, 733 n.12 (Alaska 1995))).

[10]      *See* former AS 43.23.095(8) (1997).

[11]      Op. at 21; *see also Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1131 (Alaska 1999) ("[T]he PFD regulations and statutes in question are bona fide requirements which ensure that benefits 'provided for residents are enjoyed only by residents,' and as such do not violate the constitutional right of interstate travel." (quoting *Soto-Lopez*, 476 U.S. at 904 n.3)).

changed that framework by creating an "allowable absence" provision separate and apart from the definition of "resident."[12]

The court finds it "significant that the substance of the amended statute mirrored the substance of the earlier statute and regulations."[13] And the court makes much of Heller's purported "acknowledgment" that the statutory changes were "only . . . 'technical changes.' "[14] But the relevant portion of Heller's brief from which the court makes this point was Heller's argument that the statutory change "made compliance with the new allowable absence statute (AS 43.23.008) a separate eligibility requirement from that of residency." Heller argued that this change was intentional and for a specific purpose, quoting a Department of Law representative during a 1998 legislative hearing, as follows:

> The bill also makes a number of technical changes all of which we support. It moves the allowable absences provisions out of the definition and into the body of the legislation, which allows us to tell people, even though you're a missionary and out of state and believe that you're an Alaskan, we don't have to tell them they're not a resident. What we can tell them, if this legislation goes through, is that, even though they may really be a resident, they don't qualify for a dividend, because they're just not on the list.[15]

I do not read from Heller's briefing any kind of concession that the change was technical and not substantive, nor would such a concession mean much with respect

---

[12]     Op. at 21-22 (citing ch. 44, §§ 5, 7, SLA 1998).

[13]     Op. at 22.

[14]     Op. at 22.

[15]     Heller attributed this statement as follows: "Tape of hearing before Senate Finance Committee on H.2, Feb. 9, 1998, Tape SFC-98 #24, testimony of Deborah Vogt (Dept. of Law)."

to a question of law. In my view the change was very substantive: the Department of Revenue wanted to change the definition of residency so it would not have to deny PFD applications based on lack of residency, and it proposed doing so by removing allowable absence considerations from the residency definition. The court, not Heller, posits that the change in definition of "resident" really was not a substantive change, and that the allowable absence framework really continued to be part of the PFD residency definition.

After the statutory change, for the entire statutory chapter regarding PFDs (AS 43.23), "resident" means:

> an individual who is physically present in the state with the intent to remain indefinitely in the state under the requirements of AS 01.10.055 or, if the individual is not physically present in the state, intends to return to the state and remain indefinitely in the state under the requirements of AS 01.10.055.[16]

Alaska Statute 01.10.055 provides the additional residency requirements that the person "make a home in the state" and demonstrate an intent to remain indefinitely "by maintaining a principal place of abode in the state for at least 30 days" and "providing other proof of intent as may be required by law or regulation."[17] The Department's relevant regulations require "establishment and maintenance of customary ties indicative of Alaska residency and the absence of those ties elsewhere."[18]

---

[16]    AS 43.23.095(7).

[17]    AS 01.10.055(a)-(b).

[18]    15 Alaska Administrative Code (AAC) 23.143(a) (2013). The Department also promulgated a list of objective indicia that provide proof bearing on a person's intent to remain indefinitely in the state. 15 AAC 23.173(g).

The court concedes "there is no dispute about Heller's intent to remain in Alaska or whether he satisfie[d] the preliminary requirement of AS 01.10.055."[19] The court instead finds a dispute concerning "Heller's qualifications under the PFD statute"[20] — but that dispute has nothing to do with residency qualifications, it has to do with residents' qualifications for allowable absences. The residency requirement for PFD purposes is set out in AS 43.23.095(7), and that requirement is that the individual be "physically present in the state with the intent to remain indefinitely in the state under the requirements of AS 01.10.055"; there can be no dispute that Heller was physically present in the state with the intent to remain indefinitely under the requirements of AS 01.10.055. In short, Heller was an Alaska resident when he was deployed to Iraq in 2005 and he was an Alaska resident in the qualifying year 2006.

Having concluded that Heller was an Alaska resident when he was deployed to Iraq, I now look at the "allowable absences" provisions that were intentionally severed from the PFD residency definition in 1998. Alaska Statute 43.23.008(a)(3) established an allowable absence for a person "serving on active duty as a member of the armed forces of the United States." There is no dispute that Heller fit this description in 2005-2006.

But under AS 43.23.008(b), a PFD applicant could not claim an allowable absence "unless the individual was a resident of the state for at least six consecutive months immediately before leaving the state."[21] The court's remarkable determination that here the word "resident" is ambiguous and its interpretation that "a resident of the state for at least six consecutive months" really means "physically reside in the state for

---

[19] Op. at 9 n.19.

[20] *Id*.

[21] Former AS 43.23.008(b) (2007).

-35- 6849

at least six consecutive months" comes from thin air.[22]  The Department makes no argument for ambiguity or the need for interpretation — as the court notes, the Department argues that although Heller was an Alaska resident, he was not an Alaska resident for the six months required by AS 43.23.008(b).[23]  And the Department's implementing regulation takes a distinctly contrary view from that of the court.  The regulation first states that "an individual who has *never* been physically present in Alaska may not claim an allowable absence under AS 43.23.008."[24]  It then states that the predicate requirement for an allowable absence is that the person be "*a state resident* for at least 180 days immediately before departure from Alaska."[25]

Nothing in the statute or the regulation suggests that physical presence for six consecutive months before departure from Alaska is a requirement for an allowable absence.  The requirement is *residency* for six consecutive months before departure from Alaska.[26]  A consecutive six-month physical presence requirement for an allowable absence, which necessarily implies *continuous* physical presence, will come as a great surprise to the many high school graduates who take an out-of-state spring break or

---

[22]     Op. at 10.

[23]     *See* Op. at 8.

[24]     15 AAC 23.163(a) (emphasis added).

[25]     15 AAC 23.163(b)(1) (emphasis added).

[26]     It is clear from the regulation that the Department was aware of the physical presence concept, and therefore could have set a consecutive six-month physical presence requirement, but did not do so.  The court states that "we give due deliberative weight 'to what the agency has done, especially when the agency interpretation is longstanding.' " Op. at 5.  It appears that for the nearly ten years before this matter arose, and to this day, the Department interprets AS 43.23.008(b) to require a person to be a state resident for six months, not to require six consecutive months of physical presence.  Yet the court disregards the Department's position and fails to explain why.

summer vacation before departing for a college outside Alaska.[27]  Under the court's

analysis these students would be ineligible for a statutorily allowable absence, as would

a person who went back and forth to Seattle for medical treatment and then later stayed

in Seattle for an extended period of time receiving treatment.[28]  Even a cursory look at

AS 43.23.008(a)'s allowable absences reveals that outside the context of Heller's

circumstances, the court's interpretation of AS 43.23.008(b) as requiring a consecutive

six-month physical presence in Alaska to support an allowable absence is patently

unworkable.[29]

The court's response to this observation demonstrates the fallacy of its

position — the court disavows a "continous" consecutive six-month physical presence

requirement by stating that "the concept of residency does not preclude temporary

absences as long as the intent to remain continues."[30]  I agree completely — that is why

the statute's consecutive six-month *residency* requirement focuses on statutorily defined

*residency* and not on physical presence.  In effect, the court has come full circle back to

------

[27]     *See* former AS 43.23.008(a)(1) (2007) (providing allowable absence for full-time secondary and postsecondary education).

[28]     *See* former AS 43.23.008(a)(5) (2007) (providing allowable absence for "continuous medical treatment").

[29]     *See, e.g.,* former AS 43.23.008(a)(2) (2007) (absence for vocational, professional, or certain other education); (a)(4) (absence for merchant marine service); (a)(6) (absence for providing care for certain critically ill family members); (a)(7) (absence for providing care for terminally ill family member); (a)(8) (absence for settling family member's estate); (a)(10) (absence while serving as a state employee).  I also wonder how the court's new interpretation that AS 43.23.008(b) requires a continuous 180-day physical presence prior to departure would work for those seeking an allowable absence for serving in Congress or as congressional staff despite traveling back and forth between Washington, D.C. and Alaska. *Cf.* former AS 43.23.008(a)(9)-(10) (2007).

[30]     Op. at 10 n.20 (citing former AS 43.23.008(b) (2007)).

the inescapable conclusion that "resident" in AS 43.23.008(b) means "resident" as defined by AS 43.23.095(7) and AS 01.10.055, and does not mean "physically present."

In my view AS 43.23.008(b) treats new residents — those who have been Alaska residents for less than six months — differently from established residents; it is not a bona fide residency requirement. Under the statutory framework instituted by the legislature in 1998, the combination of AS 43.23.095(7) and AS 01.10.055 — *not* AS 43.23.008(b) — distinguishes bona fide residents from passers-through. Upon establishing a principal abode in the state, displaying an intent to remain a resident indefinitely, and establishing customary ties to the state, a person becomes a bona fide resident and must be treated as other residents under AS 43.23. But AS 43.23.008(b) provides that an allowable absence may not be claimed unless a person "was a *resident* of the state for at least six consecutive months immediately before leaving the state";[31] this is "not simply a waiting period after *arrival* in the State; it is a waiting period after *residence* is *established*."[32] Consequently, AS 43.23.008(b) is a durational residency requirement — not a bona fide residency requirement — regardless of its purpose.

Under strict scrutiny review, the suspect provision must be necessary to further a compelling state interest. Moreover, the suspect provision must be drawn with precision and must be narrowly tailored to serve legitimate objectives.[33] The objective of AS 43.23.008(b) is to help ensure that only permanent, bona fide residents of Alaska

---

[31]    Former AS 43.23.008(b) (2007) (emphasis added).

[32]    *Dunn v. Blumstein*, 405 U.S. 330, 350 n.20 (1972) (emphasis added) (defining a durational residency requirement).

[33]    *Id.* at 343 ("And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.").

receive PFDs — certainly a legitimate state interest.[34] But even if the interest were compelling, the statute's six-month residency requirement creates a classification crudely excluding both nonresidents (or passers-through) and bona fide residents alike, and such a "classification is all too imprecise."[35] It would not be unduly burdensome for the Department to determine on an individualized basis whether an applicant relying on an allowable absence provision is in fact a bona fide resident; the Department already requires the establishment of an abode and provides a list of other objective indicia of an intent to remain indefinitely, including tax, school, voter registration, and motor vehicle registration records.[36] Because it creates an overbroad classification by conclusive presumption, rather than by the precision and tailoring required under law, I conclude that AS 43.23.008(b) violates the United States Constitution.

---

[34] *See Martinez v. Bynum*, 461 U.S. 321, 328 (1983) ("A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents."); *see also Dunn*, 405 U.S. at 351 ("The State's legitimate purpose is to determine whether certain persons in the community are bona fide residents.").

[35] *Dunn*, 405 U.S. at 351.

[36] *See* 15 AAC 23.173(g).